782 F.2d 1094
 39 Fair Empl.Prac.Cas. 1590,
39 Empl. Prac. Dec. P 35,836, 54 USLW 2408
 Clement A. SNELL, Willie Lawrence, Oscar Byrd, John Hammond,
Raymond Ramos, James Henderson, and Victor Delgado, For
Themselves and All Persons Similarly Situated, Toni L.
Jackson, William M. Berry, Leonard A. Hopson, Ronald
Williams, Walter L. Richardson, Vincent Richardson, James B.
Richardson, Anna Lewis, Camellia Turpin, Darlene Pressley,
Joseph E. Neal, Paulette Trent, Plaintiffs-Appellees,
v.
SUFFOLK COUNTY, A Municipal Corporation Organized pursuant
to the Laws of the State of New York, and John P.
Finnerty, as Sheriff of Suffolk County, Defendants,
John P. Finnerty, As Sheriff of Suffolk County, Defendant-Appellant.
 Nos. 558, 687, Dockets 85-7455, 85-7499.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1985.
Decided Jan. 22, 1986.
 
 James M. Catterson, Jr., Sp. Counsel for Suffolk Co., Port Jefferson, N.Y. (Snitow & Pauley, William H. Pauley, III, Scott M. Yaffe, of counsel), for defendants-appellants.
 William M. Brodsky, New York City (Baden Kramer Huffman & Brodsky, P.C., of counsel), for plaintiffs-appellees.
 Before KAUFMAN, TIMBERS, and NEWMAN, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 Title VII of the Civil Rights Act of 1964 provides that an employee has a right to a working environment free of racial harassment. On this appeal, we are presented with the assertion of this right in an uncommon context. Appellees, sixteen black and Hispanic correction officers, seek to enlist their employer's aid in cleansing an atmosphere universally recognized as harsh and oft-times cruel--a prison facility. Acknowledging that racial slurs in prisons are often difficult to control, we nevertheless believe the County's prior efforts must be augmented, and affirm the judgments below.
 
 
 2
 Before proceeding to the merits of this action, we pause briefly to set forth the factual background that led to this appeal.
 
 BACKGROUND
 
 3
 In May 1981, four black and Hispanic Suffolk County correction officers filed charges of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). In separate but identical complaints, Officers Oscar Byrd, John Hammond, Raymond Ramos and Willie Lawrence[1] alleged that Suffolk County and its Sheriff's Department ("the County") had purposefully maintained policies and practices that discriminated against them, and others similarly situated, by failing to recruit, hire and promote racial minorities. According to the officers, the County refused to assign racial minorities to "more desirable" positions within the Sheriff's Department and failed "to take appropriate action to correct the present effects of past discriminatory practices."
 
 
 4
 These complaints were brought to the attention of the Sheriff by the Suffolk County Attorney's office in both June and July of 1981. When no action was taken by the EEOC within 180 days of the filing date, the minority officers obtained identical "right to sue" letters from the Department of Justice, authorizing each recipient to bring suit in his own behalf. 42 U.S.C. Sec. 2000e-5(f)(1).
 
 
 5
 On December 30, 1982, the four men, together with black and Hispanic officers Clement Snell, James Henderson and Victor Delgado--who had not previously filed charges with the EEOC--brought suit in the United States District Court for the Eastern District of New York. Echoing the substance of their EEOC complaints, the officers charged appellants Suffolk County and Suffolk County Sheriff John P. Finnerty (as administrator of the Suffolk County Correctional Facility) with establishing a pattern and practice whose intended effect was to deny black and Hispanic officers their right to equal employment opportunities.
 
 
 6
 The officers sought both equitable relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq., and damages pursuant to 42 U.S.C. Sec. 1983. Appellees requested a declaratory judgment that the alleged practices were unconstitutional and an injunction requiring their prohibition. Moreover, the officers sought assignment to the jobs they claimed they would have had but for the County's discriminatory practices, as well as damages for lost wages.
 
 
 7
 Appellants denied all the substantive allegations in the complaint, and appellees moved for class certification. Chief Judge Weinstein denied the motion because the proposed class was not sufficiently numerous to prevent joinder of all interested persons. Thereafter, the district court instructed appellees' counsel to canvass other minority officers and permit them to join in the action if they desired. By order of January 4, 1984, thirteen plaintiffs, none of whom had exhausted his or her administrative remedies, were joined in the action. Chief Judge Weinstein waived the EEOC filing requirements, however, and the trial proceeded as nineteen separate lawsuits, each involving a Title VII action to be considered by the court and a section 1983 claim to be tried by jury.[2]
 
 
 8
 During presentation of the plaintiffs' case, it became apparent that the minority officers were experiencing difficulty specifying instances in which they had been denied assignment or promotion because of their race. Accordingly, plaintiffs' testimony increasingly focused on specific incidents of racial harassment and ethnic slurs, depicting a general racial animus in the prison against black and Hispanic officers.
 
 
 9
 Correction Officer Ramos testified, for example, that in January 1983, several white officers dressed an Hispanic inmate in a straw hat, sheet and sign that read "Spic," and referred to him as "Ramos's son." Ramos stated he reported the incident to his supervisory lieutenant and wrote directly to Sheriff Finnerty, Warden Romano, Deputy Warden Flammia and Chief of Staff Antoncic. Ramos claimed the lieutenant accused him of trying to "make waves," while a fellow officer warned him, "we know how to take care of fellows like you."
 
 
 10
 Several days later, Chief of Staff Antoncic informed Ramos that his investigation revealed the incident had never occurred. When Ramos produced photographs of the inmate in Hispanic dress, the Chief of Staff then stirred himself to refer the matter to the Internal Affairs division. Ramos stated his car had been vandalized in the jail's parking lot, and he repeatedly received harassing telephone calls at his home, presumably because of his complaints. A civil service hearing was held several months later, but Ramos was never officially notified of the result.[3] After testifying at the hearing, Ramos was greeted with a sign and chants by white officers declaring, "We have the spic. We won."
 
 
 11
 Testimony of other minority officers revealed that Officer Ramos's experience was not an isolated incident. They too had been repeatedly subject to offensive racial epithets and demeaning ethnic quips concerning their appearance and intelligence. The evidence at trial painted a bleak picture relating to the daily usage of such slurs as "nigger," "coon," "black bitch," and "spic." These sentiments were echoed by a proliferation of racially derogatory "literature" posted on bulletin boards and walls throughout the main thoroughfares of the correctional facility. Included among these vilifications were "study guides" for minority officers comprised of puzzles commonly found in children's books, as well as a questionnaire for black officers containing virtually every conceivable racially offensive cliche. Minority officers were confronted with cartoons and "doctored" photographs favorably portraying the Ku Klux Klan, offensive photographs of half-naked black men and women in African garb, a picture of a black man with a noose around his neck and another whose message clearly likened black people to "game" fit for hunting.
 
 
 12
 Moreover, two minority officers testified they had been denied access by white guards to a locked bathroom. Accordingly, one officer was forced to urinate in a receptacle he found in the inmates' living quarters. Other officers stated they had anonymously received Ku Klux Klan applications and "advertisements" for the "Niggers Back to Africa Movement" in their mailboxes at work. Yet another officer testified she felt so demeaned by the constant racial derision that she chose to eat lunch apart from her fellow officers to avoid unnecessary harassment. Finally, more than one employee stated that the level of racial hostility was so acute that they feared white officers might not respond to their calls for assistance.
 
 
 13
 Aside from Officer Ramos's experience with an inmate dressed in Hispanic garb, two other incidents were formally investigated. Walter Richardson complained that at a "Family Day" gathering of prison employees and their wives, he and his spouse were offended by a white officer's supposedly humorous quip that prison employment fosters racial prejudice. The white officer said he no longer enjoyed watching basketball because the sight of black men running up and down the court reminded him of his working environment. The incident was investigated and the responsible officer was relieved of his community relations assignment.
 
 
 14
 Similarly, female officer Pressley testified that a white civilian employee had referred to her as a "nigger" and a "black bitch" in front of other employees. Sergeant Pressley complained that such conduct undermined her authority in the workplace. After an investigation by Internal Affairs, the white woman received an official reprimand. We note, however, that the results of these investigations were never publicly disclosed.
 
 
 15
 The district judge carefully charged the jury on appellees' two section 1983 claims--discrimination in assignment and promotion and an atmosphere of racial harassment.[4] The jury found for the County on appellees' claims of discrimination in assignment and promotion, and awarded damages to only three of the remaining sixteen plaintiffs based upon the Sheriff's failure to correct an atmosphere of racial and ethnic hostility within the Suffolk County Jail.[5]
 
 
 16
 Following the jury's verdict, Chief Judge Weinstein rendered his decision on the Title VII claims. He found appellees to have been "subjected to vicious, frequent, and reprehensible instances of racial harassment," constituting a "concerted pattern of harassment," which deprived them of their Title VII rights. Snell v. Suffolk County, 611 F.Supp. 521, 526 (E.D.N.Y.1985). Because he also determined appellants had taken inadequate steps to redress the continuous racially invidious climate of the institution, the district judge ordered the Warden of Suffolk County to appear before all correction officers and "declare that the County will not tolerate any correction officer's action discriminating against another correction officer because of his or her minority status." Id. at 532. The Warden was further instructed to forbid the use of racial epithets; the posting or distribution of derogatory bulletins; mimicking officers in stereotypical fashion and the use of racial, ethnic or religious slurs and humor. The court ordered the Warden to state also that such actions would result in prompt and severe discipline. Id. at 531-32.[6]
 
 
 17
 Appellants timely filed a notice of appeal.
 
 DISCUSSION
 
 18
 Appellants raise four issues on appeal. Because two of appellants' arguments present questions of first impression in this Circuit, we now address each claim ad seriatim.
 
 
 19
 A. EEOC Filing Requirements (The "Single Filing" Rule)
 
 
 20
 Appellants contend the district court erred by waiving the EEOC filing requirements for those officers who neither filed charges nor received "right to sue" letters.[7] Citing Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), they argue the policy behind Title VII filing requirements is to encourage "[c]ooperation and voluntary compliance ... as the preferred means" for achieving equality of employment opportunities. Id. at 373, 99 S.Ct. at 2349 (quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974)). Accordingly, appellants claim the EEOC was denied the opportunity to arbitrate and possibly resolve each individual allegation of discrimination.
 
 
 21
 The appellees urge this Court to adopt the "single filing rule," which provides that where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims "aris[e] out of similar discriminatory treatment in the same time frame." Ezell v. Mobile Housing Board, 709 F.2d 1376, 1381 (11th Cir.1983). The rule thereby avoids unnecessary repetition of EEOC filings where the initial complaint went unaddressed. This presupposes, of course, that the subsequent claims are sufficiently similar to the original complaint and the employer received adequate notice and an opportunity for conciliation.[8] See, e.g., Foster v. Gueory, 655 F.2d 1319 (D.C.Cir.1981); Allen v. Amalgamated Transit Union Local 788, 554 F.2d 876 (8th Cir.), cert. denied, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977); Wheeler v. American Home Products Corp., 563 F.2d 1233 (5th Cir.1977).[9] Accordingly, the officers contend that because the initial filings were not investigated, additional filings concerning similar allegations of discrimination were unnecessary.
 
 
 22
 In Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), the Supreme Court ruled that the statutory time limit for filing charges is not a jurisdictional prerequisite to a Title VII suit in district court. Rather, the Court analogized the filing requirement to a statute of limitations, which could be waived or tolled where deemed equitable by the district court. Zipes, however, reiterated the principle underlying the filing procedure, "to give prompt notice to the employer," id. at 398, 102 S.Ct. at 1135, thereby encouraging conciliation where possible.
 
 
 23
 In Foster v. Gueory, supra, a case factually similar to the one before us, the Court of Appeals for the District of Columbia Circuit permitted intervenors in a Title VII action to maintain their discrimination claims after class certification had been denied, although the intervenors had not exhausted their administrative remedies. Reasoning that the allegations of discrimination were sufficiently similar to the EEOC charge filed by one plaintiff, the court concluded that the principal function of the filing requirements--notice and an opportunity for conciliation--had been satisfied, and therefore filings by the other plaintiffs would have been a futile exercise. Id. 655 F.2d at 1323.
 
 
 24
 In a subsequent decision, the District of Columbia Circuit articulated the appropriate standard for waiving the filing requirements. "[W]here two plaintiffs allege that they were similarly situated and received the same discriminatory treatment, the purposes of the exhaustion requirement are adequately served if one plaintiff has filed an EEOC complaint." De Medina v. Reinhardt, 686 F.2d 997, 1013 (D.C.Cir.1982). See Crawford v. United States Steel Corp., 660 F.2d 663, 665-66 (5th Cir.1981); see also Dalton v. Employment Security Comm'n, 671 F.2d 835, 838 (4th Cir.1982).
 
 
 25
 In the dispute before us, Judge Weinstein found the officers' Title VII claims arose out of virtually identical circumstances, thereby rendering additional filings a "wholly fruitless" endeavor. 611 F.Supp. at 523. We agree. The evidence adduced at trial clearly indicated that the minority officers were subjected to a virtual barrage of racially offensive slurs and demeaning epithets that directly affected their work. All these incidents were of a similar nature and occurred at the Suffolk County Correction Facility within a three-year period. Moreover, the EEOC filings put Suffolk County on notice of "discrimination like or reasonably growing out of such allegations." Caldwell v. National Ass'n of Home Builders, 771 F.2d 1051, 1054 (7th Cir.1985); see Griffin v. Carlin, 755 F.2d 1516, 1522 (11th Cir.1985). An investigation by the EEOC would certainly have revealed this evidence of pervasive racial hostility.
 
 
 26
 Such an inquiry, however, was never made. No action was initiated during the 18 months that transpired between the filings and the officers' receipt of their "right to sue" letters. Moreover, the Sheriff's Department did not attempt to address the specific allegations charged in the EEOC complaint any time before the commencement of this action. There is scant reason to believe, therefore, that the additional claims of the non-filing officials would have been settled extra-judicially.
 
 
 27
 We adopt the "single filing" rule, and, on the evidence before us we cannot say the district court's finding that the claims were sufficiently related was erroneous. Anderson v. Bessemer City, U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Accordingly, Chief Judge Weinstein properly waived the EEOC filing requirement in this case.
 
 B. Expanding the Scope of the Trial
 
 28
 Appellants next claim the district court impermissibly manipulated the substantive grounds of the suit by injecting a new issue--the atmosphere of racial harassment--that had not specifically been alleged in the complaint. The County denies it ever consented either expressly or implicitly to this new cause of action, and hence did not receive its day in court.
 
 
 29
 We are, of course, mindful of the mandate of procedural due process, requiring adequate notice and an opportunity to be heard. Doubleday & Co., Inc. v. Curtis, 763 F.2d 495, 502-03 (2d Cir.1985). Nevertheless, we are compelled to reject appellants' arguments. Although a racially charged environment was not specifically alleged in the complaint, the record clearly supports appellees' contention that the County had ample notice and sufficient time within which to prepare its defense. Accordingly, appellants' characterization of the district court's action as an "eleventh hour adoption of a legal theory" is wholly unavailing.
 
 
 30
 During presentation of the plaintiffs' case, there were several explicit indications that an atmosphere of racial harassment was an independent cause of action being tried both to the jury pursuant to Sec. 1983, and to the court pursuant to Title VII. Midway through the plaintiffs' case, Chief Judge Weinstein dictated for the record the substance of a conference at which the parties agreed that "racial harassment" was an independent ground upon which relief was being sought. Shortly thereafter, in denying Suffolk County's motion to dismiss Officer Delgado's complaint, the district court ruled that a reasonable juror might find for Delgado based upon a racially discriminatory environment.
 
 
 31
 Moreover, both sides to the litigation requested differing jury instructions on the standard for finding employer liability by failing to correct a racially hostile atmosphere. At the charging conference, once the trial court had modified the charge with the approval of appellants, defense counsel did not raise an objection. Finally, the district court explicitly relied on an atmosphere of racial hostility to deny the County's motion to dismiss at the conclusion of plaintiffs' case.
 
 
 32
 Despite these repeated indications, counsel for the County never objected. Failure of defense counsel to do so further demonstrates the absence of surprise on the County's part. Moreover, appellants never asked for a continuance to prepare an adequate defense. Having actually litigated the issue of racial hostility, the County cannot belatedly claim to have been prejudiced. Accordingly, appellants impliedly consented to trial on this issue, within the meaning of Fed.R.Civ.P. 15(b). See, e.g., Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 680-81 (2d Cir.1985); Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1086 (2d Cir.1977).
 
 
 33
 C. Employer's Liability for a Racially Hostile Environment
 
 
 34
 The County also argues that a racially hostile environment did not exist, or if it did, the district court applied an erroneous standard by which to evaluate an employer's liability for its existence in the workplace. We disagree with both contentions.
 
 
 35
 1. Racial Harassment at the Correction Facility
 
 
 36
 42 U.S.C. Sec. 2000e-2(a)(1) provides that an employer may not "discriminate against any individual with respect to ... terms, conditions or privileges of employment, because of such individual's race." It is well-established in other Circuits that a working environment overrun by racial antagonism constitutes a Title VII violation. Gilbert v. City of Little Rock, 722 F.2d 1390 (8th Cir.1983); Walker v. Ford Motor Co., 684 F.2d 1355 (11th Cir.1982); Johnson v. Bunny Bread Co., 646 F.2d 1250 (8th Cir.1981). The Fifth Circuit put it succinctly, "a discriminatory and offensive work environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers" may constitute a violation of Title VII. Vaughn v. Pool Offshore Co., 683 F.2d 922, 924 (5th Cir.1982) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).
 
 
 37
 To establish a hostile atmosphere, however, plaintiffs must prove more than a few isolated incidents of racial enmity. Gilbert, supra, 722 F.2d at 1394; EEOC v. Murphy Motor Freight Lines, Inc., 488 F.Supp. 381, 384 (D.Minn.1980). Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute. See Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87, 88 (8th Cir.1977); Winfrey v. Metropolitan Utilities Dist., 467 F.Supp. 56, 60-61 (D.Neb.1979). In sum, the alleged harassment "must be sufficiently pervasive ... to ... create an abusive working environment." Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982). Whether racial acrimony in a particular institution is "sufficiently pervasive" to constitute a Title VII violation is to be determined from the totality of the circumstances. Id. at 904.
 
 
 38
 We agree with Chief Judge Weinstein that a racially hostile environment existed at the Suffolk County Correctional Facility. The record clearly supports his finding that the proliferation of demeaning literature and epithets was sufficiently continuous and pervasive to establish a "concerted pattern of harassment" in violation of Title VII. Snell, supra, 611 F.Supp. at 526 (quoting Fekete v. United States Steel Corp., 353 F.Supp. 1177, 1186 (W.D.Pa.1973)).[10]
 
 
 39
 In light of this compelling evidence, we reject appellants' contention that the scurrilous postings and racial epithets occurred only sporadically and did not rise to the level of a Title VII violation. Moreover, their reliance on Vaughn v. Pool Offshore Co., 683 F.2d 922 (5th Cir.1982), is misplaced. Although the environment in most of our nation's correction institutions may properly be characterized as coarse and rowdy, this case, unlike Vaughn, does not present circumstances involving "instances of humiliating acts shared by all."
 
 2. Liability of County and Sheriff
 
 40
 Turning to the more difficult question on this appeal, we now address the requirements for holding an employer liable pursuant to Title VII, once a sufficiently deleterious atmosphere of racial harassment between co-workers has been established.
 
 
 41
 Citing the district court's language, "defendants have ignored or failed to take reasonable steps to prevent these abuses," 611 F.Supp. at 522 (emphasis added), appellants claim the trial judge imposed a standard approaching strict liability.[11] Fearing such a heavy responsibility will transform Sec. 1983 and Title VII into general federal tort statutes, appellants urge us to adopt a standard pursuant to which an employer must have actively participated in the discrimination, or condoned it to such a degree, that a pattern and practice was created.[12]
 
 
 42
 As stated by the First Circuit, "an employer may not stand by and allow an employee to be subjected to a course of racial harassment by co-workers." DeGrace v. Rumsfeld, 614 F.2d 796, 803 (1st Cir.1980). In DeGrace, the First Circuit held the good intentions of an employee's direct supervisor "cannot insulate [other supervisory personnel] from [the] failure to correct the racially offensive conduct." Id.
 
 
 43
 The court elaborated on the difficulties encountered in this most sensitive area:
 
 
 44
 It may not always be within the employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race.
 
 
 45
 Id. at 805.
 
 
 46
 We find the analysis of the First Circuit persuasive. This standard places a reasonable duty on an employer who is aware of a racially discriminatory atmosphere adversely affecting the emotional well-being and productivity of its employees to take reasonable steps to remedy it. Whether an employer has fulfilled his responsibility in this regard is to be determined upon the facts in each case. Factors that may be considered are the gravity of the harm, see id. at 805, the nature of the work environment, see Vaughn, supra, 683 F.2d at 925, and the resources available to the employer. Accordingly, we hold today that once an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it.
 
 
 47
 Applying this standard to the facts of this case, we cannot say Suffolk County and its Sheriff's Department were sufficiently forceful in quieting the atmosphere of racial harassment existing at the Suffolk County Correctional Facility. Although we by no means charge appellants with intentionally fostering such an environment--and recognizing the harsh and sometimes brutal nature of jail life--we agree with the district court that inadequate measures were taken to avoid the proliferation of racial slurs and literature.
 
 
 48
 Appellants strenuously argue, however, that they took all reasonable steps to promote and preserve a good working environment. In support, they refer us to a single announcement posted throughout the facility stating that the use of racial slurs are prohibited by the operating manual and would result in disciplinary action. Moreover, they allege that virtually every instance of racial harassment that was brought to the attention of the Sheriff's Department was ultimately referred to and investigated by their Internal Affairs division and appropriate disciplinary action taken. While these measures are commendable, they certainly did not exhaust the field of reasonable and feasible actions appellants might have taken.
 
 
 49
 Indeed, the Sheriff did not adequately "let it be known" that racial slurs and the posting of derogatory materials would not be tolerated. DeGrace, supra, 614 F.2d at 805. Clearly, the County investigated the complaints of Officers Ramos, Pressley, and Richardson, and took disciplinary action where it was deemed appropriate. But these incidents constitute only a fraction of the instances of racial harassment most of which went uninvestigated.[13] Moreover, each person whose complaint was investigated testified he or she was never officially notified of the result.
 
 
 50
 Additionally, Sheriff Finnerty testified that he was aware of the EEOC filings and professed to maintain an "open door" policy for all employees to bring their grievances directly to him. Yet this policy was never publicized in any way. In light of the totality of the circumstances, the one official declaration regarding the prohibition against racial epithets clearly was not sufficient.
 
 
 51
 Finally, evidence adduced at trial indicated that although the appointment of an Affirmative Action Officer was mandated by Suffolk County regulations, none who testified was ever informed of that officer's identity. It appears that Chief of Staff Antoncic, who several times had tried to persuade complainants that the incidents of racial harassment never occurred, occupied that position. In light of these facts, it is not surprising that several officers were forced to seek redress from sources outside the institution.
 
 
 52
 Although the Sheriff and Warden acted, a pall of silence hung over their efforts, muffling their efficacy. Accordingly, the district court, in fashioning appropriate relief, attempted to open channels of communication that had been sorely underused by correction authorities. We note with approval that Judge Weinstein's order relies on available resources and does not unduly burden Suffolk County.
 
 D. Judicial Notice
 
 53
 As a final matter, we are asked by appellants to premise reversal on Chief Judge Weinstein's somewhat uncommon use of judicial notice. The district judge dealt at length with a vast array of literature exploring the social consequences of ethnic humor.
 
 
 54
 With the exception, however, of judicial notice of conduct rising to the level of racial hatred existing in Suffolk County, no other materials were noticed as "adjudicative fact." Fed.R.Evid. 201. Adjudicative facts are "the ultimate facts in the case, plus those evidential facts sufficiently central to the controversy that they should be left to the jury unless clearly indisputable." 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence Sec. 5103 at 478 (1977). Rather, with the above-mentioned exception, the district court noticed only "legislative facts." See id. Secs. 5102 -03; see also Advisory Committee Note to Fed.R.Evid. 201. Judicial notice was therefore not required.
 
 
 55
 Moreover, appellants have not demonstrated any prejudice caused by the district court's actions. See F.R.Civ.P. Without considering the judicially noticed facts, we would nevertheless affirm the judgments below. Accordingly, appellants' allegations at best constitute harmless error.
 
 CONCLUSION
 
 56
 The underlying theme of the individual claims asserted on appeal is Suffolk County's contention that Chief Judge Weinstein, deeply troubled by the level of racial hostility evident at its Correctional Facility, permitted his reaction to the evidence to lead him into error. After careful consideration of appellants' claims, however, we conclude the district court applied the correct legal standard to factual findings that are not clearly erroneous.
 
 
 57
 Accordingly, the judgments of the district court are affirmed.
 
 
 
 [1]
 A fifth officer, Steven E. Berry, left the employ of Suffolk County and never joined in the lawsuit
 
 
 [2]
 By the time the jury was charged on the section 1983 claims, sixteen plaintiffs remained. Officer Trent withdrew prior to trial and Officers Williams and Neal withdrew during the course of the trial
 
 
 [3]
 After a formal investigation was conducted by the Internal Affairs division, the Sheriff asked for the resignation of the correction officers he deemed responsible for the incident. When those officers refused to resign, the Sheriff formally filed charges against them and a full civil service hearing was held. At the conclusion of the hearing, at which Officer Ramos testified, the two white officers were exonerated
 
 
 [4]
 Chief Judge Weinstein charged the jury that they were to consider whether each defendant was separately liable to each individual plaintiff. Concerning the Sec. 1983 claims they were to consider, he instructed the jury:
 The plaintiffs assert two bases for relief. First, that they were assigned to duties or denied assignment on the basis of race or national origin and, second, that the general racial and ethnic animosity of fellow workers created inferior working conditions.
 J.App. at 1523a.
 After instructing the jury on the bases of each of these claims, the district court continued:
 In determining liability, you must consider each plaintiff and each defendant separately. In order for the Sheriff to be liable in this case, you must first be satisfied by a preponderance of the evidence that one or more of the plaintiffs was a victim of discrimination as I have instructed you. You must next be satisfied by a preponderance of the evidence that the Sheriff was either directly responsible for the alleged discrimination or that he acquiesced in discrimination, expressly by actions or failing to take appropriate action. That is to say, in order for the Sheriff to be liable, it is not necessary that he personally authorized the discrimination or that he personally discriminated. It is sufficient if he is aware of complaints of discrimination or of conditions of discrimination and failed to take steps within his power and authority to investigate and to [d]eal adequately with the unlawful practices that are all[e]ged.
 Id. at 1529a.
 On the Sheriff's liability for discrimination in assignment and promotion claims, the district court stated:
 Accordingly, you may find the Sheriff liable if you are satisfied by a preponderance of the evidence that the Sheriff knew or was told about the claims of discrimination, that discrimination existed and that he made inadequate efforts to remedy the situation under the conditions then existing.
 Id. at 1529a-30a.
 Finally, regarding the liability of Suffolk County, the court continued:
 A local government may not be found liable under Section 1983 for an injury inflicted solely by its employees or agents. It is only when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts or failures to act may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under Section 1983.
 Thus, before you may hold the defendant County of Suffolk liable to any individual plaintiff, you must find the injury inflicted on that individual was the result of the enforcement of or the adherence to an official pol[i]cy or custom--policy or custom--of the County or of the Sheriff's Office....
 Even if defendant [sheriff] is liable, you can only find the County liable if the plaintiff has shown that his injury resulted from execution of a policy or custom of the County or the Sheriff's Department.
 Id. at 1530a-31a.
 
 
 [5]
 The jury found for each of the three plaintiffs who had been publicly humiliated, and perhaps ironically, those whose complaints were ultimately investigated by Internal Affairs. The jury awarded Officer Ramos $7,500, Sergeant Pressley $2,500 and Officer Walter Richardson $1,500
 
 
 [6]
 The injunction further ordered the Warden to describe the methods by which future complaints are to be processed, and to describe the duties of the "Affirmative Action Officer" and the Department of Internal Affairs concerning allegations of discrimination within the correction facility. The injunction also directed the Warden to "take further action as he believes necessary" to further combat discrimination in the jails. Finally, Chief Judge Weinstein instructed counsel for both parties to caution their clients to "forego any gloating or recriminations over [the] litigation," in order to promote a more harmonious working environment. Snell, supra, 611 F.Supp. at 532
 
 
 [7]
 42 U.S.C. Sec. 2000e-5(e) provides:
 A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against when such charge is made within ten days thereafter....
 42 U.S.C. Sec. 2000e-16(c) further states:
 [A]fter one hundred and eighty days from the filing of the initial charge with the department, agency or unit ... until such time as final action may be taken by a department, agency or unit, an employee ... may file a civil action as provided in section 2000e-5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.
 
 
 [8]
 Judge Griffin Bell stated the rationale:
 It would be wasteful, if not in vain, for numerous employees, all with same grievance, to have to process many identical complaints with EEOC. If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume that the next one would be successful.
 Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 498 (5th Cir.1968).
 Although that discussion was directed toward a class action where common questions of law and fact exist, the principle applies equally well to non-class actions where the allegations of discrimination arise out of the same circumstances and within the same time frame. See, e.g., Ezell v. Mobil Housing Board, 709 F.2d 1376, 1381 (11th Cir.1983).
 
 
 [9]
 But see, Hodge v. McLean Trucking Co., 607 F.2d 1118 (5th Cir.1979); Inda v. United Airlines, Inc., 565 F.2d 554 (9th Cir.1977), cert. denied, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); Schulte v. State of New York, 533 F.Supp. 31 (E.D.N.Y.1981)
 
 
 [10]
 Many of the officers testified to the demeaning effect the repeated abuse by their co-workers had on their emotional stability in the workplace. For example, Officer Ramos testified that the acts of discrimination made him feel "degraded" and caused him "mental distress." He stated that his job performance was "impaired," and characterized the working environment at the jail as "a very difficult situation; physically and mentally so."
 These observations were echoed by many of his fellow officers. Officer Snell testified that the repeated ethnic slurs in the lunchroom "upset" him. Officer Jackson testified to feeling "hurt and humiliated" when she viewed the derogatory postings. Words such as "demeaning" and "degrading" were consistently offered in response to questions concerning the working environment in the Suffolk County jail. Finally, when asked about the effect the alleged discrimination in assignment had on his emotional health, Officer Byrd responded, "Like you're fighting a losing battle. There have been times when you don't want to work anymore. You are totally destroyed, morally or whatever.... It makes you feel less than a man or a whole human being...."
 
 
 [11]
 We disagree with appellants that the district court applied a standard grounded in strict liability. Rather, Chief Judge Weinstein found that
 [t]he evidence shows that more forceful action could have been but was not taken to ameliorate or eliminate these deleterious working conditions. No effective action was taken to extinguish rampant racial slurs. There was no follow-up on the few halting steps that were taken notifying correction officers of a Suffolk County policy to eliminate discriminatory working conditions.
 
 
 [611]
 F.Supp. at 528
 These words do not apply a strict liability rule. As we read them, they merely indicate that the Sheriff, once notified, failed to take reasonable steps to combat the abuse.
 
 
 [12]
 At oral argument, counsel for Suffolk County claimed it was ironic that out of sixteen plaintiffs, the jury awarded damages to only the three officers whose complaints were ultimately investigated and where disciplinary measures were taken in two cases. Based on the clarity of the district court's charge, see supra note 7, and the Sheriff Department's failure to publicize that disciplinary action was taken together with the continued abuse, we cannot say the evidence was not sufficient to support the jury's verdict
 
 
 [13]
 The majority of the correction officers testified they had reported the slurs and postings to their superior officers. Because of the "paramilitary" structure of the jail facility, however, correction officers were directed to report their grievances to their immediate superiors who, in turn, were to report them to the "chain of command." The record is replete, however, with grievances that went unaddressed. Officer Snell, for example, testified that he reported the incident in which white guards would not open the tier doors to allow him to use the officers' bathroom. No action was taken. Further, when he showed his duty sergeant derogatory literature he had removed from facility walls, the sergeant merely told him to throw it away. In another incident, when Officer Ramos confronted Warden Romano and Deputy Warden Flammia with a "spic and span" cut-out and a Ku Klux Klan application he had received, Flammia promised to speak to each crew as they arrived for work and caution them about such conduct. This was never done, nor was any memo posted. Finally, after Sergeant Byrd met personally with Sheriff Finnerty to discuss racial tension in the jail, the sheriff never posted a notice as promised
 Moreover, several witnesses testified they chose not to report the offensive conduct to which they had been subject for fear of retribution by their co-workers. Officer Henderson, for example, testified that he did not want to be viewed by white officers as a "trouble maker," and was concerned they might not come to his assistance when necessary. Indeed, Officer Richardson testified that when he asked a white officer to discontinue posting derogatory literature, the officer responded that he was a personal friend of both the Warden and his deputy and would see to it that Richardson would be "taken care of" if he persisted. We note that other officers testified they did not report their concerns, believing such efforts would prove futile.