Bernice M. JOHNSON, Plaintiff,

v.

**GENERAL MOTORS CORP.,
Defendant.**

No. 87–C–35–S.

United States District Court,
W.D. Wisconsin.

Oct. 5, 1987.

Jeff Scott Olson, Madison Wis., for plaintiff.

Susan R. Maisa, Foley & Lardner, Milwaukee Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Before the Court is the defendant's motion for summary judgment. Plaintiff is seeking damages under 42 U.S.C. § 1981 for the defendant's failure to take the steps necessary to remedy racial harassment of plaintiff by her co-employees. Jurisdiction is properly asserted under 28 U.S.C. § 1343.

This case presents several questions concerning the elements of a racial harassment claim. Some of these questions cannot be resolved due to the existence of disputed material facts, or, more accurately, disputed factual inferences from otherwise undisputed facts. These will be addressed briefly before consideration of the dispositive questions since they have some bearing on the adequacy of the defendant's response to racial harassment.

The facts pertinent to the motion will be related where necessary in the memorandum which follows.

## MEMORANDUM

The elements of a prima facie case of racial harassment under either 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. have not been specifically set forth in an appellate decision in this circuit. From the decisions of several other circuits, the Court in *Moffett v. Gene B. Glick Co., Inc.*, 621 F.Supp. 244 (N.D.Ind.1985), formulated the following set of formal elements:

(1) the employee belongs to a protected group;

(2) the employee was subject to unwelcome harassment;

(3) the harassment complained of was based on sex (or race);

(4) the harassment complained of affected a term, condition or privilege of employment;

(5) respondeat superior; that is, that the employer knew or should have known of the harassment and failed to take prompt remedial action; and

(6) the employee acted reasonably under the circumstances.

*Id.* at 266. Except for the fact that the fifth element is incorrectly termed "respondeat superior," *Hunter v. Allis–Chalmers*, 797 F.2d 1417, 1421 (7th Cir.1986), these elements represent a reasonable method for analysis, although a racial harassment claim has been stated less formally:

[T]he failure to take reasonable steps to prevent a barrage of racist acts, epithets, and threats can make an employer liable if management-level employees knew, or in the exercise of reasonable care should

have known, about the campaign of harassment.

\*   \*   \*   \*   \*   \*

[A]n employer who has reason to know that one of his employees is being harassed in the workplace by others on grounds of race, sex, religion, or national origin, and does nothing about it, is blameworthy.

\*   \*   \*   \*   \*   \*

The employer's liability thus is not strict, as it would be under respondeat superior; his only duty is to act reasonably in the circumstances.

*Id.* at 1421–22 (citations omitted).

From the framework set forth in *Moffett*, the Court concludes that except for 3 and 5 there is either a genuine dispute about these elements, or plaintiff's presentation is sufficient to resolve them in her favor. It is important to note the background facts for this conclusion.

Plaintiff Bernice Johnson is an employee of the defendant General Motors Corporation, employed as an inspector at the company's automobile manufacturing plant in Janesville, Wisconsin. She has been so employed since 1975, and for some time has worked the second shift. She readily admits that, except for the incidents encompassing the present dispute, she has not been subjected to racially demeaning treatment or harassment and that the co-workers on her shift have been friendly, helpful and supportive.

Her duties as an inspector require her to finally inspect cars and trucks coming from the assembly line for defects and the presence of items listed on the shipping manifest. The work takes place in the shipping building where cars are delivered by drivers to one of three lanes in which the inspectors perform their duties. Adjacent to these lanes are tables, chairs, and benches for use of the employees during periods when there are not vehicles to inspect. Plaintiff used a particular wooden bench almost exclusively. There was also a desk and a shelf near this bench where plaintiff had placed some personal items.

Beginning in late February 1985 and continuing until April 20, 1985, the bench, desk and shelf were routinely altered or destroyed when plaintiff reported to work. Early in this series of incidents plaintiff's personal effects were found in the trash. At first plaintiff and a co-worker would return the bench to position, only to find that it had been moved again the next day. After a few days the bench began to disappear altogether, and a substitute bench had to be found. By mid-March the company provided a replacement bench that was chained to the wall. At about this time plaintiff took vacation, from March 15, 1985 to March 25, 1985. During that period the new bench which had been chained to the wall was not tampered with, and was used without incident by those performing plaintiff's duties including, for a couple of days, a black man. Immediately after plaintiff returned, the chains were cut and the bench disappeared. It was replaced by a wooden plank with cement blocks. Shortly thereafter razor blades were imbedded in the underside of the plank so that if the plank were grasped from the sitting position, plaintiff's fingertips would have been cut. In short order this bench was destroyed with the cement blocks being smashed. Replacement benches were thereafter similarly destroyed on an almost daily basis. On one occasion razor blades were found scattered around the area even though razor blades were used only in another area of the building. In early April a nonremovable bench was installed, but on April 20 nails were imbedded in the wall behind the bench so that anyone using the bench could not lean against the wall. Also during this period water and soft drinks were routinely spilled on the bench. Finally, shortly after April 20, plaintiff took a medical leave of absence due to mental distress and depression. She remained on leave until August 1, 1985. No further activities of this kind have occurred since.

■ These facts are largely undisputed, although the sequence of events is largely taken from plaintiff's proposed findings. The parties dispute certain characterizations of the evidence. The defendant

insists, tediously if not pointlessly, that the events amount to "horseplay." By this characterization defendant apparently wishes to dispel any suggestion that a serious problem existed. The Court rejects this characterization, at least for purposes of this motion, because the facts suggest a long-running, concentrated, destructive effort on the part of the perpetrators. The other disputed characterization is plaintiff's attempt to have the bench included as part of plaintiff's workstation. It appears to the Court that this dispute is both tedious and pointless because it makes no difference. The bench was immediately adjacent to the area where plaintiff performed her duties; it was supplied by the company and was intended to be used by the plaintiff in the manner she used it; its repeated destruction clearly affected a "term, condition, or privilege of employment" within the meaning of Title VII, and was important enough, if its destruction was racially motivated, to implicate § 1981.

Plaintiff, as a black female, is clearly a member of a protected group. Even if the plaintiff was not an intended victim of the destruction of the workbench, a conclusion which is possible, she claims harm from racially discriminatory acts. She should be considered a member of the protected class under § 1981 if she is injured by intentional, racially discriminatory conduct. For instance, in *Moffett*, the plaintiff was a white female who was subjected to racial harassment by white co-employees because of her relationship to a black man.

It is also clear that plaintiff did nothing to encourage the harassment, much less incite it. This is the inquiry necessitated by the second element of the claim. *Moffett*, 621 F.Supp. at 267. The conduct to which plaintiff was subjected was clearly unwelcome. Plaintiff's reactions were not unreasonable. Accordingly, the sixth element is satisfied. The fourth element is also satisfied because of the close association between the destruction of the property and plaintiff's duties.

Under the facts of this case the two remaining elements are closely connected. Reasonably enough the law requires that the harassment complained of must be based on race for purposes of § 1981. Under most circumstances this requirement is obviously satisfied by the nature of the harassment in that the actions of the perpetrators are characterized by their racial content. See for example *Hunter*, 797 F.2d at 1420 (racial graffiti); *Moffett*, 621 F.Supp. at 254 (racially and sexually oriented comments). See also *Bohen v. City of East Chicago*, 799 F.2d 1180 (7th Cir.1986) (sexual harassment evidenced by sexual innuendo, touching and threats of rape); *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986) (sexual innuendo, but not so pervasive and debilitating to constitute a claim). However, here the harassment took the form of destruction of property which was used by the plaintiff and owned by the defendant. There was no overtly racial content to the destruction.

■ The Court cannot determine whether there is sufficient evidence to convince a factfinder that the harassment was racially motivated. This destructive behavior was directed at only the bench plaintiff used, although there were a number of others provided for the same purpose in the same area. The destruction apparently stopped when plaintiff vacationed and continued when she returned. Perhaps most significant, there is evidence to suggest that those suspected of committing these acts were two drivers from the earlier shift who had a personal dispute with a black man who used the same bench as plaintiff and that actions toward him had some racial overtones.

There is, however, another consideration that is not particularly addressed by the parties. It is clear, in the context of a discriminatory hiring, discharge or promotion case, that the employer is not liable for being motivated by a poor reason, but only a discriminatory one. *Benzies v. Illinois Dept. of Mental Health*, 810 F.2d 146 (7th Cir.1987). It is equally obvious that an employer cannot be held liable for failing to take reasonable steps to stop racial harassment if the employer had no reason to suspect that the harassment was racially motivated. The law does not require an

employer to insure the happiness of its workers, but that the employer take reasonable steps to insure that the workplace is not permeated with racism. Section 1981 requires a showing of intentional discrimination. *General Building Contractors v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) is analogous. The Court held that a class of building contractors could not be held liable for discriminatory hiring practices in a union hall of which it knew nothing. Accordingly, if the defendant did not know about the racial motivation behind these destructive acts, it was not required to take remedial action. The only other circumstance which would justify the imposition of liability is where the employer refused to act because of the plaintiff's race despite the lack of any indication of racial motivation on the part of the perpetrators. See *Bohen,* 799 F.2d at 1190–92 (Posner, J., concurring). There is no indication of any such motivation on the part of the employer here. Plaintiff's claim is that the defendant did not take reasonable steps to remedy the situation.

■ The Court concludes that plaintiff has at least created an issue of fact as to whether the employer knew about the racial motivation of the perpetrators. Although not dispositive, the fact that plaintiff expressed her belief almost immediately that the destruction of the bench was racially motivated is important. More significant is the fact that plaintiff's supervisor expressed agreement with that sentiment, again very early in the sequence of events. Given these facts, it is not unreasonable to require investigation into the situation unless the employer shows a race neutral reason for not so doing.

This leaves the question of the reasonableness of the defendant's response. At the outset the Court rejects plaintiff's assertion that an employer has a duty to take "all" reasonable steps to remedy the situation. For this proposition plaintiff cites *Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2nd Cir.1986), where the Court faulted the employer for failing to "exhaust the field of reasonable and feasible actions."

Arguably, the Court in *Snell* was elaborating on the language of the First Circuit in *DeGrace v. Rumsfeld,* 614 F.2d 796, 805 (1st Cir.1980):

He [the employer] cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race.

*Id.* The plaintiff reads these decisions too broadly and in any event, this Circuit does not require the employer to exhaust the list of feasible alternatives in order to discharge its duty to employees victimized by racial harassment.

In both *Snell* and *DeGrace* the courts recognized that the reasonableness of the remedial actions taken by the employers was a function of the circumstances of the case:

Whether an employer has fulfilled his responsibility in this regard is to be determined upon the facts in each case. Factors that may be considered are the gravity of the harm, the nature of the work environment and the resources available to the employer.

*Snell,* 782 F.2d at 1104, relying on *DeGrace* and *Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir.1982). This language undercuts the suggestion of the citations in the previous paragraph that the law mandates a thorough exhaustion of possible remedies. Logically it would be the unusual case where a plaintiff could not suggest a reasonable course of action which the employer had not undertaken. The imagination of plaintiffs should not be the measure of liability.

Furthermore, in *Hunter,* 797 F.2d at 1422, the Court emphasized that the employer's "only duty is to act reasonably in the circumstances." The plaintiff in *Hunter* was victimized by a "vicious campaign of racial harassment," *id.,* characterized by

racial graffiti, notes to the plaintiff which were threatening and overtly racist, and other destructive acts clearly directed at him. Unfortunately, the Court merely termed the employer's response as "half-hearted" without elaboration. *Id.* at 1420. According to the court, this evidence was sufficient to justify a jury verdict because the company was "negligent" in responding to the harassment, *id.* at 1422, even though the case was close, *id.* at 1423. In *Moffett,* 621 F.Supp. at 271, the court noted that the adequacy of an employer's response, while varying with the circumstances, must be sufficient to convey the idea that the employer does not tolerate such behavior. It is not sufficient, in the face of a blistering, racially oriented attack, to merely state that such behavior is not tolerated, as in *Snell.* Nor is it sufficient to threaten discipline if such activities are continued, and then fail to carry out the threat, as in *Moffett.*

■ Considering these somewhat divergent holdings, the Court cannot determine whether the defendant's response to the harassment in this case was reasonable. As shown by the affirmance of the "close case" in *Hunter,* the reasonableness of an employer's efforts will often be a jury question. Summary judgment is appropriate unless there is a genuine issue of material fact in dispute, a "genuine" issue being one which a reasonable jury could decide in favor of the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The standard is the same for a directed verdict, *id.* at 2511, and summary judgment is appropriate when the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 2512. It is also clear that a failure of proof on an essential element of the nonmoving party's case "renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Summary judgment is not appropriate where plaintiff has been able to present triable issues on the question of the reasonableness of the defendant's response to the racial harassment which may have occurred.

The company took a number of actions during the period in question in response to the destructive behavior. From the previous factual narrative, the company continually replaced the bench. It is also clear that plaintiff was not deprived of a place to sit during this period since there were always other benches available. Plaintiff first complained about this action to her supervisor, Daniel Dixon, and her Union representative perhaps as early as the second time the bench was moved. Dixon reviewed the area each time the bench was moved or destroyed and agreed with plaintiff and several other co-workers that the activity was probably racially motivated. His first response was to inform his counterpart on the earlier shift of the movement of the bench when it was clear that workers on that shift were responsible. The first shift supervisor, Ken Schwanke, informally spoke to the drivers under his supervision about this activity. At some point early in March, Dixon had heard rumors that three particular drivers on the first shift were responsible. When the activity became destructive, Dixon again informed Schwanke and also informed him of the identity of those suspected of carrying on this activity. However, at this time and for practical purposes, at any time thereafter, the defendant's supervisory personnel did not have actual evidence that these drivers were responsible.

Biddle Gunn, the first shift general supervisor, informed first shift employees of the destructive activity and that the company would impose discipline on anyone causing such a problem. On March 13th, when Gunn learned that first shift drivers were probably responsible, he warned the drivers as a group to stop such activity. Again on April 1st, Gunn, with two Union officials, told the first shift employees that materials in the area where Johnson worked were to be left alone. One of those Union officials also agreed to a request by the company's Labor Relations Supervisor to pass the word that the company would not tolerate such activity.

By this time the company had also instituted periodic stakeouts of the area in order to identify the perpetrators. On about ten occasions during the last three weeks in March a security officer observed the area from a position where he could not be seen by those entering the building before the beginning of the first shift, the time during which the company suspected the activity was taking place. First shift supervisors made an effort to watch the area during the shift, and third shift security officers were instructed to particularly watch the area. Despite these efforts, the company was unable to obtain any concrete evidence of the identity of the persons responsible for the destruction of the bench. Therefore, no discipline relating to these incidents was ever imposed.

Finally, the company decided to install the nonremovable bench on about April 1st, and did install it on April 9th, with a cabinet which was added later in the month. By this action the defendant was attempting to remove what it perceived as the reason for the destructive behavior. The company had been informed that a black man, Leon Peterson, had been using the bench during the first shift and had allowed his legs to sprawl into the lane of traffic, making it difficult for the drivers to do their jobs. The bench was constructed so that it could be folded from the way on first shift.

Plaintiff suggests that the company could have done more. Specifically, she faults the company for failing to question first shift employees more vigorously. She also suggests that more effective surveillance could have been instituted. The defendant responds that finding fault with the fact that it did not question the suspected perpetrators and others simply ignores the realities of a unionized industrial facility. There was simply no reason to expect cooperation from employees who consider themselves in an adversarial relationship with the company. The defendant also suggests that plaintiff's complaint concerning ineffective surveillance is merely a complaint about lack of success.

The defendant's responses to the plaintiff's arguments are perhaps well taken. *Hunter*, which both parties recognize as the most significant authority on this subject, expressly recognizes that complete eradication of racial animus in the workplace is probably unattainable. 797 F.2d at 1421. The Court recognized that an employer probably cannot stop the isolated racial slur but that harassment can be remedied:

> Other grounds for the distinction between the isolated slur and the campaign of harassment are that, the more slurs there are, the more harm they will do to the victim and the more the employer can do about them. He can reduce the frequency of racial slurs markedly, even if not to zero—so long as their frequency is not close to zero to begin with.

*Id.* at 1422. Even where plaintiff is entitled to an inference that this case concerns a campaign of racial harassment, the defendant may only be required to take actions to mitigate the activity to an irreducible minimum. Given the fact that the harassment never was explicitly racial, perhaps the defendant did not fail. The defendant took actions which escalated as the destructive behavior escalated. The bench was continually replaced in order to ameliorate the impact of the activity on the plaintiff's working conditions. Employees were repeatedly warned about such conduct, and continually more people were enlisted in the attempt to stop the harassment. Surveillance was attempted, but produced no results. Finally, the company addressed what appeared to be the most immediate cause of the activity, the friction between the first shift drivers and Leon Peterson. From all appearances in the record, this action was, at long last, successful.

The Court, however, is unable at this point to conclude as a matter of law that these efforts were adequate.

The Court also notes that while this case has been analyzed on the basis of proof of the elements of a racial harassment claim, § 1981 requires proof of intentional discrimination. *General Building Contractors*, 102 S.Ct. 3141. In *Bohen v. City of*

*East Chicago,* 799 F.2d 1180, 1191 (7th Cir.1986), a sexual harassment case where intent to discriminate was also necessary, Judge Posner in his concurring opinion stated as follows:

> Indeed, an effort that fell far short of being reasonable could still rebut an inference of intentional discrimination—the only type of discrimination the equal protection clause forbids. Suppose the defendants were distressed at the sexual harassment in the fire department and did their best to stamp it out, but their best was very poor—was below an objective standard of reasonable care. Still it would be hard to say they were guilty of intentional discrimination, when their intent was not to discriminate.

Where it may be determined that the defendant falls short of some reasonableness standard, it may then be necessary to determine whether that failure is sufficiently egregious to allow an inference of discriminatory intent where defendant's efforts were undisputedly designed and implemented to stop the activity about which plaintiff complains.

### ORDER

IT IS ORDERED that the motion of the defendant General Motors Corporaton for summary judgment is DENIED.