**Kenneth WILLIAMS, Plaintiff,**

v.

**The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant.**

No. 87–CV–2827 (JS).

United States District Court, E.D. New York.

March 31, 1995.

**982** .

Kenneth Williams, Roosevelt, NY, pro se.

Law Offices of Milton H. Pachter by Richard D. Williams, New York City, for defendant.

### OPINION AND ORDER

SEYBERT, District Judge:

This action was tried before the Court on April 5, 15, and 18, 1994. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4). Venue for this action lies within the Eastern District of New York as the alleged events in question transpired principally at John F. Kennedy International Airport (JFKIA), located in Queens County, New York.

In this action, plaintiff Kenneth Williams alleges that his employer, The Port Authority of New York and New Jersey (hereinafter, the "Port Authority"), *inter alia,* · discriminated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981. He asserts five distinct claims; the first three claims arise under Title VII, the fourth is asserted under 42 U.S.C. § 1981, while the last seeks redress under New York State law. First, plaintiff contends that he was wrongfully denied a promotion because of his race. Second, plaintiff claims that his workplace was racially hostile. Third, plaintiff maintains that the Port Authority and its employees retaliated against him for speaking out against alleged racially-motivated employment practices, and for filing three separate complaints with the Equal Employment Opportunity Commission (EEOC). Fourth, plaintiff asserts a cause of action against his employer under 42 U.S.C. § 1981 alleging contractual discrimination relative to the Port Authority's refusal to promote him to a new position of employment. Finally, plaintiff asserts a pendent state-law claim of assault, that also interweaves the theory of intentional infliction of emotional distress.[1] As his remedy, plaintiff seeks $1,000,000 in damages and equitable relief.

Having considered the evidence presented by the parties, the Court makes the following Findings of Fact and Conclusions of Law.[2]

---

1. On March 8, 1988, plaintiff filed an amended complaint asserting the following claims: (1) failure to be promoted in violation of Title VII; (2) a pendent claim for defamation; and (3) a pendent claim that interweaves the elements of intentional infliction of emotional distress and assault. The second claim, for defamation, was dismissed by Judge Spatt on October 3, 1991. *See* Docket sheet entry # 43. The plaintiff has not requested reconsideration of the dismissal of the defamation claim; accordingly, this claim is not before the Court at this time. In any event, the Court notes that this claim is barred by the one-year statute of limitations on defamation actions insofar as the plaintiff has failed to show publication of any defamatory statement subsequent to November 1985. This date is more than one year before both the filing of plaintiff's initial charge with the EEOC, and the commencement of this action. *See* 44 N.Y.Jur.2d §§ 238–239, at 47–52 (1994); *infra* Findings of Fact ¶¶ 20–21.

   Further, the Court notes that in view of the plaintiff's appearance at trial *pro se,* and his presentation of evidence at trial touching upon such matters, the Court shall read plaintiff's Title VII cause of action expansively to embrace not only a claim of (a) wrongful denial of promotion, but also claims under Title VII asserting (b) a racially hostile workplace, and (c) unlawful retaliation in response to plaintiff's voicing of objection to alleged racially-motivated employment practices, and plaintiff's filing of charges with the EEOC. For similar reasons, the Court regards the plaintiff to have asserted a cause of action against his employer under 42 U.S.C. § 1981 alleging contractual discrimination relative to the Port Authority's refusal to promote him to a new position of employment. *See* Tr. at 15–16 (4/18/94, afternoon proceeding) (statement of defense counsel noting plaintiff's assertion of a claim under 42 U.S.C. § 1981). ·

2. The Court notes that since this action was commenced prior to November 21, 1991, the Civil Rights Act of 1991 does not apply to this case. *See* Landgraf v. USI Film Products, 114 S.Ct. 1483, 1488, 1508 (1994) (1991 amendments to Title VII do not apply to preenactment conduct); Rivers v. Roadway Express, Inc., 114 S.Ct. 1510, 1519–20 (1994) (1991 amendments to 42 U.S.C. § 1981 are not to be applied retroactively).

## FINDINGS OF FACT

1. Plaintiff Kenneth Williams, a black male, commenced employment with the Port Authority in 1971 as a baggage handler in the International Arrivals Building at JFKIA. Tr. 73 (4/5/94); Def.Ex. U. In October 1988—after this action was commenced—plaintiff moved laterally to the position of Bus Terminal Agent,[3] the position in which he is presently employed. Tr. 87–88 (4/5/94).

2. Defendant Port Authority is a bi-state agency that was created by the states of New York and New Jersey with the consent of Congress. Def.'s Am.Ver. Answer. Defendant's principal offices are located at One World Trade Center in Manhattan. *Id.* Defendant's primary business objective is to promote and facilitate commerce within the New York/New Jersey metropolitan area. *Id.*

### Procedural Background and EEOC Charges

3. In 1987, plaintiff filed three charges of discrimination against the defendant with the EEOC. Def.Ex. U–1, U–2, & U–4. First, on January 12, 1987, plaintiff filed EEOC charge 160–87–0590, claiming that he was subjected to racially derogatory remarks and intimidation by Duty Supervisor John Mitchell and Ground Supervisor Larry Coyle, both white males. Plaintiff further asserted that the Port Authority manifested a racially hostile work environment, beginning on or about December 1985, and continuing through the date of this EEOC claim. *Id.* Plaintiff contends that this conduct was in response to plaintiff's participation "in a protest meeting objecting to [the Port Authority's] unfair employment policies and practices...." Def. Ex. U–4.

4. Second, on February 5, 1987, plaintiff filed EEOC charge 160–87–0832 alleging that he was subjected to further harassment, intimidation, and racial slurs as a result of his attendance and participation in a race-relations meeting held on December 6, 1985. Def.Ex. U–1. Plaintiff further asserted that the Port Authority, in December 1986, wrongfully denied him a promotion to the position of Terminal Services Agent because of his race. *Id.* Shortly thereafter, on March 25, 1987, plaintiff filed his third EEOC claim, charge 160–87–0959, wherein he alleged that the defendant retaliated against him for filing the February 5, 1987 EEOC charge. Def.Ex. U–2.

5. On April 30, 1987, after conducting an investigation of the allegations set forth in plaintiff's first EEOC charge, the EEOC issued a decision finding no reasonable cause to believe that any of plaintiff's allegations were true. Def.Ex. U–5.

6. On December 18, 1987, the EEOC issued a determination with respect to plaintiff's second and third EEOC charges. The Commission concluded that the Port Authority did not violate Title VII by harassing the plaintiff or refusing to promote him because of his race. Def.Ex. U–3.

7. Upon the EEOC's issuance of a right-to-sue letter, plaintiff timely commenced the instant Title VII action asserting the following three claims: (1) that, as late as December 1986, he was wrongfully denied opportunities for promotion because of his race; (2) that from December 1985 through his commencement of the instant action on August 11, 1987, he was repeatedly subjected to public racial harassment; and (3) that during this same time period, he was threatened with retaliation and bodily harm as a result of his employer's hostile work environment. *See* Pl.Compl.; Def.Ex. U–5.

8. On March 8, 1988, plaintiff filed an amended complaint asserting the following claims: (1) failure to be promoted in violation of Title VII; (2) a pendent claim for defamation; and (3) a pendent claim that interweaves the elements of intentional infliction of emotional distress and assault. *See* Pl. Am.Compl. The second claim, for defamation, was dismissed by Judge Spatt on October 3, 1991. *See* Docket sheet entry #43.

### Allegations Concerning Failure To Promote Because Of Race

9. Plaintiff alleges that, in December 1986, he was denied a promotion to the posi-

---

**3.** The position of Bus Terminal Agent requires Mr. Williams to provide information to the public concerning the Port Authority bus lines, and to notify maintenance or the police in the event that any problems develop at the Port Authority Bus Terminal.

tion of Terminal Services Agent because of his race through the Port Authority's arbitrary refusal to pass him on the oral portion of the examination for promotion. Tr. 83 (4/5/94). The position of Terminal Services Agent is a supervisory position relative to baggage handlers, and requires one so employed to "function as a point of contact with patrons, airline representatives, government agency personnel and other Port Authority employees by performing such activities as answering questions, coordinating the delivery of baggage handler and sky cap services, handling patron complaints ... interacting with government and airline personnel [and] coordinating the baggage operation by assigning baggage from arriving aircraft to belts in the Customs Hall during off-peak hours." Def.Ex. Q (description of job assignment contained in oral portion of 1986 Terminal Services Agent examination).[4]

10. Plaintiff failed both the written and oral portions of the 1986 Terminal Services Agent examination. Tr. 84, 86–87, 122 (4/5/94). On the oral portion of this examination, the plaintiff's score was 50.16%; a score of 65% was required to pass. See Def.Ex. P. The Court notes that the plaintiff has put forth no evidence to suggest that the Port Authority discriminated against him in connection with his failure to pass the written portion of the 1986 promotional examination. In connection with this matter, the Court specifically finds that the Port Authority did not change the minimum criterion for satisfactory completion of the 1986 Terminal Services Agent examination after the plaintiff took this examination. Plaintiff's results on the 1986 examination thus are to be contrasted with the 1983 examination, in which he passed the written portion, but failed the oral portion. Tr. 83 (4/5/94).

11. The Port Authority administers the Terminal Services Agent examination to establish a list of workers eligible for promotion to this position. Id. at 125. A Port Authority employee taking this examination must pass both the oral and written portions thereof to be placed on this eligibility list. Id. at 83–84.

12. With respect to the 1983 oral examination, plaintiff contends that Supervisor John Faldetta entered the room in which he was taking the oral examination and instructed one of the proctors to fail him. Id. at 83–84. The Court notes that this alleged incident predates the period of time complained about to the EEOC, and addressed within the amended complaint. In any event, in view of the absence of evidence to corroborate plaintiff's claim, and the Court's credibility and perception determinations with respect to plaintiff's allegation, the Court declines to find that Faldetta improperly instructed the proctor.[5]

13. The Court further declines to credit plaintiff's uncorroborated assertion that he "believed" that certain white supervisors had arbitrarily designated him to fail the 1986 oral examination. Id. at 122–24.

14. The Court expressly finds that the Port Authority did not conduct the oral portion of the 1986 Terminal Services Agent examination in a discriminatory manner that adversely affected one particular racial group relative to another. In this regard, the Court finds that in connection with the administration of the Terminal Services Agent examination on November 25, 1986 and December 11, 1986, 6 out of 9 white applicants (66⅔%), and 9 of the 17 black applicants (52.9%), passed the oral portion of the examination. See Def.Ex. P. Based upon the record, the Court is unable to find that the

4. Other than a handwritten grade sheet that reports the plaintiff to have attained a score of 70% on an examination administered on May 8, 1985 (the indicated passing score was 75%), see Def. Ex. P, no evidence was introduced at trial concerning plaintiff's assertion, as stated in Paragraph 12 of his Amended Complaint, that during 1985, he applied for promotion to the position of Airport Operations Agent, taking a written examination therefor, and that his failure to pass this examination was attributable to the Port Authori-

ty's adoption of a new method of scoring. See Pl.Am.Compl. ¶ 12. Accordingly, in view of the absence of probative evidence supporting plaintiff's allegation of impropriety or discriminatory administration on the part of the defendant, the Court declines to find that the administration of this examination discriminated against minorities, including the plaintiff, to any extent.

5. Neither the plaintiff nor the defendant called John Faldetta to testify at trial.

disparity in pass rates between black applicants and white applicants resulted from a discriminatory administration of the written or oral portions of the examination.

15. The Court further finds that the 1986 Terminal Services Agent oral examination was fairly comprised of relevant questions, in the form of hypotheticals, regarding typical problems that a Terminal Services Agent could expect to encounter during the course of his or her employment, and therefore constituted "a reasonable measure of job performance." Griggs v. Duke Power Co., 401 U.S. 424, 436, 91 S.Ct. 849, 856 (1971). Representative questions asked the applicants how they would respond to such matters as (1) the receipt of complaints by patrons concerning poor service, or rude treatment, by the baggage handlers; (2) a medical emergency; (3) baggage handler misconduct; (4) security concerns; (5) conflicting complaints from airline representatives over the allocation of scarce baggage handler resources; (6) equipment shortages; (7) luggage-belt breakdowns; and (8) patron assistance. See Def. Ex. Q. Moreover, in view of the comprehensive weighted scoring system employed by the Port Authority in grading the candidates' answers, the Court finds that the Port Authority did not arbitrarily grade the oral portion of the Terminal Services Agent examination. See id. Specifically, the oral examination consisted of five separate sections, which were designed to test a candidate's aptitude in the following areas: (1) patron relations; (2) operations judgment with regard to service matters; (3) operations judgment with regard to potentially acrimonious incidents; (4) interpersonal relations; and (5) communication skills. See id.

16. In addition, insofar as the plaintiff has failed to produce evidence to substantiate any medical expenses he incurred as a result of a stressful work environment, the Court declines to find that he incurred any substantial unreimbursed medical expenses. These alleged out-of-pocket expenses include the cost of psychiatric care, and the cost of medication to treat his high blood pressure and

diabetes. Tr. 92–93 (4/5/95). This finding further applies to plaintiff's claim in his amended complaint that he incurred severe mental distress; the Court likewise finds that such was not incurred. Similarly, plaintiff has not corroborated his estimate that he ultimately sustained a loss of earnings of approximately $300,000. Id. at 93, 160–61.

17. The Court expressly finds that the Port Authority did not discriminate against the plaintiff on the basis of his race in refusing to promote him to the position of Terminal Services Agent. The Court specifically finds that the Port Authority's insistence upon passage of both the written and oral portions of the Terminal Services Agent examination constituted a reasonable prerequisite for promotion to this position, and that this examination was fairly compiled and administered by the Port Authority in such manner as not to discriminate against minorities. The Court further finds that the plaintiff's failure to pass this examination rendered him "unqualified" for the position of Terminal Services Agent insofar as no evidence was introduced at trial to suggest that an individual employed as a baggage handler at JFKIA during the period in question could be promoted to the position of Terminal Services Agent without passing both the written and oral portions of the Terminal Services Agent examination.

### Allegations Concerning Racially Hostile Workplace and Employer Retaliation

18. At trial, plaintiff testified to a number of incidents in which he contends that he was addressed by his supervisors, either directly, or from a distance, with racially derogatory language. Among the supervisory personnel that plaintiff testified to have used racial slurs in his presence are: (1) Supervisor Carol Mack; (2) Duty Supervisor John Mitchell; (3) Supervisor Peter Punzo; and (4) Operations Group Supervisor Lawrence Coyle. At trial, each of these individuals (except for Peter Punzo, who is deceased) denied using such language in plaintiff's presence.[6]

6. Mr. Punzo, in his deposition testimony, likewise denied using racial slurs in speaking to the plaintiff. See Def.Ex. A.

19. With regard to the use of racial slurs in plaintiff's presence, the Court notes that Mr. Williams' testimony was uncorroborated except for the testimony of John Brady in connection with the alleged use of racial slurs, in single incidents, by Peter Punzo, Tr. 68 (4/15/94) (testimony of John Brady), Lawrence Coyle, *id.* at 70, and John Mitchell. *Id.* at 68. In view of the evidence presented at trial and the Court's credibility determinations with respect to the witness' testimony, the Court finds that although some racial slurs may have been enunciated by his supervisors within plaintiff's range of hearing, it was not to the prevalence suggested by plaintiff.

20. Plaintiff contends that, on November 10, 1985, an incident indicating a racially hostile work environment transpired after he was accused by a Port Authority supervisor named Vernon Holdip, himself a black male, of demanding a ten dollar tip from two white female passengers for carrying their bags in the customs hall.[7] Mr. Holdip, and another supervisor named John Fernandez, also a black male, notified Duty Supervisor John Mitchell that Holdip had observed Williams receive this gratuity.[8] Tr. 133 (4/5/94); 101–02 (4/15/94). Upon being so notified, Mitchell convened a meeting with plaintiff, himself, and Jim Morrisey, a customs hall supervisor, to discuss this allegation. Tr. 102 (4/15/94).

21. According to plaintiff, Mitchell called him into his office, where Mitchell used a racial slur, backed the plaintiff against the wall, and threatened "to get [him]." Tr. 75 (4/5/94). This incident was observed to some degree by John Brady—a white-male supervisor in the Transportation Section, who was employed by the Port Authority for twenty-eight years, until his termination in 1991, Tr. 162–65 (4/5/94)—who testified that he entered Mitchell's office during the meeting, and heard Mitchell call the plaintiff a racial slur. Tr. 68 (4/15/94). On cross-examination, Mitchell conceded that Brady may have been able to hear much of what was said at this meeting, testifying as follows:

Let me just explain. When the meeting was over, I went to open the door and Mr. Brady almost fell in on top of us when we were having the meeting. He was sitting in the corner outside where the transportation desk is.

Tr. 109 (4/15/94).

22. The Court notes, however, that Mr. Brady has a material interest in this case in view of his own pending actions against the Port Authority before another Judge of this Court. Tr. 179–80 (4/5/94). The Court finds Mr. Brady's personal stake in this litigation to diminish substantially the probative value of many of the incidents to which he testified that did not directly involve the plaintiff.

23. The plaintiff also contends that Mitchell regularly referred to him with racial slurs whenever the two came in contact, and that nothing was ever done to remedy this, or any other incident involving the use of racial slurs, when plaintiff complained about the same to his supervisors at the Port Authority, Tr. 82, 137–38 (4/5/94), or to his union delegate. Tr. 74–75. The Court, in view of its credibility assessments with respect to the conflicting testimony presented at trial, finds that racial slurs were used by white supervisory personnel in plaintiff's presence on not more than five occasions during the period between November 1985 and August 1987—the time period complained about in this action.

24. As earlier alluded, plaintiff further alleges that, even though he continually reported the foregoing circumstances to management, the Port Authority did nothing to correct this situation. Tr. 137–38 (4/5/94). For example, plaintiff insists that he reported Mitchell's use of racial epithets to supervisor John Faldetta immediately after each incident occurred, and that Faldetta assured the plaintiff that he would take care of the situation. Tr. 74–75, 137–38 (4/5/94). Plaintiff, however, testified that he did not know if Faldetta ever investigated the Mitchell incident and his other complaints of racial hostility. *See id.* at 138. Aside from the plaintiff's

---

7. The Port Authority does not allow baggage handlers in the customs hall of the International Arrivals Building—where the plaintiff worked—to accept tips from patrons.

8. Plaintiff denies that he requested, or received, a gratuity from the patrons in question.

uncorroborated speculation, no evidence was presented at trial to suggest that the Port Authority failed to take reasonable measures to investigate the plaintiff's complaints. In point of fact, the reasonableness of the Port Authority's investigative measures is suggested through the meetings the Port Authority scheduled, at the request of John Brady, to allow its employees to air any race-related concerns. These meetings are discussed in the paragraphs that follow.

25. During the Fall of 1985, John Brady called Wilbert Taville, and told him that the skycaps and baggage handlers at the JFKIA were being discriminated against, harassed, and subjected to a racial slurs by their supervisors. Tr. 115 (4/15/94). Taville, a black male, throughout the period in question held the position of "Equal Opportunity Coordinator" for the Port Authority, and was responsible for investigating discrimination complaints and coordinating investigations by the EEOC. Id. at 111–15. During this conversation, John Brady requested that Taville schedule a meeting to hear these complaints, and told Taville that he expected approximately forty skycaps and baggage handlers to attend. Id. at 115–16.

26. In response to Brady's request, Taville scheduled a meeting for November 19, 1985 at the World Trade Center. This meeting was attended only by seven persons other than Mr. Taville; the plaintiff Kenneth Williams was not present at this meeting. See Pl.Ex. 4 (memorandum to the file by Wilbert L. Taville dated Nov. 20, 1985). At this meeting, three sky caps (i.e., manual workers who carried bags for patrons to awaiting cars or taxi cabs), and a senior operations agent, concurred in a number of allegations, asserting among other things that "[t]he bigotry, intimidation and harassment of minorities is known, condoned and carried out by a group of management/supervisory personnel referred to as the 'Kangaroo Court;'" that an operations supervisor named Daniel Dugo made a racially derogatory comment with respect to the skycaps' prospective conduct at a Christmas party; that a white temporary supervisor named Alfred Kaminsky was demoted because he got along well with minorities; that a white supervisor ripped down notices of the meeting and threw them in the garbage; that skycaps and baggage handlers were arbitrarily "written up" by their supervisors for contrived reasons; and that a black supervisor named Lola Christopher was singled out for harassment, and subsequently demoted. Id.

27. In connection with this meeting, plaintiff testified that he and several of his co-workers, Eric Cumberbatch, James Dandy, and Cornelius Parker, were deliberately turned away at the door, and therefore prevented from attending this meeting. Tr. 139–40 (4/5/94). According to plaintiff, he became aware of the November 19, 1985 meeting by reading an informational flier which the Port Authority had posted outside the baggage handler dispatch office. Id. at 77–79, 140. Plaintiff asserts that he and his three co-workers were turned away from the meeting by an unidentified white male seated at a desk outside the meeting room, who told them that there was no meeting in progress. Id. at 77, 140–43. Plaintiff further testified that upon being advised that no meeting was in progress, he requested to speak with Wilbert Taville, but was told by both the man seated at the desk and an unidentified white female, that Wilbert Taville was not present. Id. at 141–42. Plaintiff's testimony in this regard was corroborated by the testimony of Eric Cumberbatch, Franklin Smith, and James Dandy, who also testified that they were informed by a person seated at a desk, outside the room where the meeting was scheduled, that there was no meeting in progress. Tr. 99 (4/5/94) (testimony of Eric Cumberbatch); Tr. 10–11 (4/15/94) (testimony of Franklin Smith); Tr. 40–41 (4/15/94) (testimony of James Dandy). According to Mr. Taville, Port Authority employees were not instructed to turn away minorities at the door. See Tr. 117 (4/15/94).

28. The Court regards the scheduling of the November 19, 1985 meeting to demonstrate that the Port Authority was concerned about a possible race-relations problem at JFKIA. In addition, the Court finds that Port Authority employees were not instructed to turn away minorities at the door.

29. As a result of the less-than-represented turnout at the November 19, 1985 meet-

ing, Taville, again at the request of John Brady, scheduled another meeting for the airing of grievances that was held on December 6, 1985 at the World Trade Center. Tr. 120–21 (4/15/94); *see* Def.Ex. O (flier advertising December 6th meeting); Pl. Ex. 1. Aside from Mr. Taville, only five persons attended this second meeting—John Brady, Louis Pisano (the Port Authority Labor Relations Supervisor), and three baggage handlers: Cornelius Parker, Franklin Smith, and plaintiff Kenneth Williams. Pl.Ex. 1 (memorandum to files by Wilbert L. Taville, dated Dec. 18, 1985); Tr. 122 (4/15/94). The topics discussed at this meeting included specific altercations that the baggage handlers in attendance had with their supervisors, and the alleged racially hostile nature of the work environment at JFKIA. *See* Pl.Ex. 1. At this meeting, the plaintiff related his account of the incident in which he was accused of improperly accepting a $10 gratuity from two patrons. *See* Pl.Ex. 1.

30. Plaintiff testified that, at this meeting, in response to a statement by Franklin Smith, Wilbert Taville stood up and pointed his finger at the assembled employees and threatened them with legal recourse in the event they brought their grievances to the attention of the EEOC, purportedly stating that the Port Authority had "fifty lawyers sitting . . . with nothing better to do; you or anybody in this room that go outside of this meeting, will be severely dealt with." Tr. 79, 157 (4/5/94). Taville, at trial, denied threatening the assembled employees with legal recourse, or any other form of retaliation in the event that a complaint was filed with the EEOC. Tr. 122–23 (4/15/94).

31. On December 17, 1985, Taville met with Richard Rowe, the General Manager of JFKIA, and told him about these two meetings, and the allegations that were made. Pl.Ex. 1, Tr. 123 (4/15/94). Afterwards, Taville toured the International Arrivals Building at JFKIA with John Mitchell and Mr. Rowe, and then individually interviewed baggage handlers and supervisors who worked in that building. Pl.Ex. 1, Tr. 104–06, 124–26 (4/15/94). Further investigative efforts were halted, however, upon the filing of a charge

with the EEOC by Mr. Brady. Tr. 128–29 (4/15/94).

32. The Court, in light of its credibility determinations concerning Mr. Taville's testimony, Tr. 122–23 (4/15/94), and moreover, the plaintiff's acknowledgement that the Port Authority did not retaliate against him for filing charges with the EEOC, Tr. 158–60 (4/5/94), declines to credit plaintiff's assertion that, at the December 6, 1985 meeting, Wilbert Taville threatened to retaliate against any employee who filed a charge with the EEOC. Further, the Court expressly finds that Mr. Taville did not attempt to discourage the plaintiff and his co-workers at JFKIA from filing charges with the EEOC. In addition, plaintiff has not presented the Court with credible evidence to establish that Mr. Taville failed to investigate thoroughly the race-relations concerns that the plaintiff and his co-workers raised at the November 19, 1985 and December 6, 1985 meetings.

33. Finally, the Court finds there to have existed at JFKIA, throughout the time period in question, a supervisor/subordinate communications problem that transcended racial boundaries. The Court further finds that differences in race, although not the predominate factor in producing disharmonious labor relations, nonetheless further exacerbated the overall breakdown in communication between JFKIA's management and its baggage handlers, and in particular, plaintiff Kenneth Williams. In addition, the Court finds that, between November 1985 and August 1987, on not more than five occasions did white supervisors utter racial slurs in the plaintiff's presence. *See supra* Findings of Fact ¶ 23.

34. Furthermore, the Court expressly finds that the plaintiff Kenneth Williams was not denied any of the benefits of his employment, treated adversely, or otherwise subjected to racial discrimination, or reprisal, through his explication of race-related grievances, including his participation in the December 6, 1985 meeting at the World Trade Center, or through his filing of charges with the EEOC. In connection with this matter, the Court also finds that the Port Authority, and the management personnel in question, including Mr. Taville, were immediately aware of the above events.

*CONCLUSIONS OF LAW/DISCUSSION*

## I. Title VII Claims

A. *Failure To Promote Because Of Race*

Plaintiff alleges that he was denied promotion to the position of the Terminal Services Agent solely because of his race. In connection with his Title VII claims, the relevant time period is that commencing in November 1985 and ending on March 25, 1987, the date that the plaintiff filed the last of his three claims with the EEOC. During this period of time, the plaintiff took the Terminal Services Agent examination on one occasion, in December 1986. As earlier discussed in the Court's Findings of Fact, the plaintiff failed both the written and oral portions of this examination; passage of both portions was a prerequisite to placement on a list of candidates eligible for promotion to the position in question. *See supra* Findings of Fact ¶¶ 10–11. The Court has further found that this examination did not serve to discriminate against minorities (either in its content, or in the Port Authority's manner of administering or grading it), constituted a reasonable measure of job performance, and operated as the sole means for promoting baggage handlers to the position of Terminal Services Agent. *See supra* Findings of Fact ¶¶ 9–11, 13–15, 17.[9]

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). "With the goal of 'progressively sharpening the inquiry into the elusive factual question of intentional discrimination,'" the Supreme Court, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 & n. 8, 101 S.Ct. 1089, 1094 & n. 8, 67 L.Ed.2d 207 (1981)).

Under the *McDonnell Douglas* framework, in order to establish discriminatory treatment under Title VII, a plaintiff first bears the burden of establishing a prima facie case of racial discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). A plaintiff establishes a prima facie case by proving by a preponderance of the evidence: (i) that he belongs to a protected class; (ii) that he applied for an available position for which he was qualified; (iii) that, despite his qualifications, he was rejected, and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824, *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094. The establishment of a prima facie case raises a rebuttable presumption that the employer unlawfully discriminated against the employee. *See St. Mary's Honor Center,* — U.S. at —, 113 S.Ct. at 2747; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.

If the plaintiff makes the required showing, a burden of production then shifts to the

9. Although this claim is not before the Court since the amended complaint fails to explicate disparate impact as a basis for recovery under Title VII, the Court, nevertheless, expressly rejects the ability of the 1986 Terminal Services Examination to serve as a basis for a disparate-impact claim, as the Court finds that this examination was "a reasonable measure of job performance." *Griggs v. Duke Power Co.*, 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971); *see Teal v. State of Conn.*, 645 F.2d 133, 140 (2d Cir.1981); *supra* Findings of Fact ¶ 15. With respect to this matter and the Court's obligation to give a liberal and expansive reading to the claims of a *pro se* litigant, the Court notes that the amended complaint was drafted by counsel, and that the plaintiff was represented by counsel through the completion of discovery, until counsel's relief on April 27, 1992. In any event, as noted in the Court's factual findings, the Court has carefully reviewed the oral portion of the 1986 Terminal Services Examination administered to the plaintiff, and has found this portion of the examination to be in all ways reasonable in testing the skills requisite for effective performance of the position in question. Moreover, the plaintiff has not raised the written portion of this examination as an issue in dispute.

employer to rebut the prima facie case. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094. This burden of production requires the employer to articulate a legitimate nondiscriminatory reason, by clearly setting " 'forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747 (emphasis in original) (quoting *Burdine,* 450 U.S. at 254–55 & n. 8, 101 S.Ct. at 1094–95 & n. 8).

If the employer succeeds in carrying its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749. Rather, the analysis is returned to the traditional burden of proof applicable to civil actions, with the plaintiff retaining the " 'ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination.' " *Id.* at —— — ——, 113 S.Ct. at 2747–48 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Thus, even should the trier of fact disbelieve the reason for the employment decision proffered by the employer, this alone is not enough to hold the employer liable under Title VII, because the plaintiff still must prove that the employer intentionally discriminated on the basis of an unlawful motive. *See id.* at ——, 113 S.Ct. at 2749.

■ In the instant case, the plaintiff fails to establish a prima facie case insofar as the Court's factual findings do not support plaintiff's contention that he was qualified for the position of Terminal Services Agent. Since the Court has found that the 1986 Terminal Services Examination constituted "a reasonable measure of job performance," *Griggs v. Duke Power Co.,* 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971), and that the Port Authority adhered to a practice of promoting to the position of Terminal Services Agent only those individuals who passed both the written and oral portions of this examination, the plaintiff fails to establish his objective qualifications for promotion. *Cf. Eshun v. New York State Dep't of Social Services,*

652 F.Supp. 455, 460 (S.D.N.Y.1987) (Failure of plaintiff to pass examination required for position constituted a contributing factor to determination that the plaintiff was not qualified for the position.). Accordingly, plaintiff's failure to pass this examination warrants the dismissal of this claim for failure to establish a prima facie case.

Further, even assuming *arguendo* the plaintiff's establishment of a prima facie case of disparate treatment under Title VII, the Court still concludes that this claim must be dismissed. In this regard, the Court notes that the defendant, through the introduction of evidence pertaining to the plaintiff's failure to pass the 1986 Terminal Services Examination and therefore establish his eligibility for promotion, has articulated a legitimate nondiscriminatory reason for not promoting the plaintiff, and consequently has negated any presumption of discrimination. Turning then to the pivotal inquiry of whether the plaintiff has persuaded the Court "that he has been the victim of intentional discrimination," *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2748 (internal quotes omitted), the Court concludes that the plaintiff has not succeeded in carrying his burden of proof, and that the defendant did not discriminate against the plaintiff in failing to promote him. Rather, the Court finds that this employment decision was motivated entirely by factors unrelated to race, including, but not limited to, plaintiff's failure to pass the qualifying examination. *See supra* Findings of Fact ¶ 17. Accordingly, even proceeding to the final analysis, the Court concludes that the plaintiff was denied promotion for wholly legitimate reasons, and therefore this Title VII claim must be dismissed.

**B.** *Hostile Work Environment And Retaliation*

Plaintiff next alleges that he was continuously subjected to a racially hostile work environment. He asserts two distinct claims in this regard. First, he contends, pursuant to Section 703(a)(1) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1), that the Port Authority, during the period in question, manifested a hostile or abusive

work environment. Second, he claims that after attending a meeting on December 6, 1985 to discuss his perception of a racially hostile workplace, he was retaliated against, in violation of Section 704(a) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3(a), and that his employer further retaliated against him upon his filing of three separate charges with the EEOC. The Court will address each of these claims in turn.

### 1. *Hostile Work Environment*

■ The Second Circuit Court of Appeals has expressly recognized the existence of a cause of action under Title VII for a racially hostile work environment. *See Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986). This is consistent with the Supreme Court's pronouncement that Title VII's scope " 'is not limited to "economic" or "tangible" discrimination.' " *Harris v. Forklift Systems, Inc.*, — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (Title VII sexual harassment claim) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). Rather, "[t]he phrase 'terms, conditions or privileges of employment' " within 42 U.S.C. § 2000e–2(a)(1), "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, — U.S. at —, 114 S.Ct. at 370 (quoting 42 U.S.C. § 2000e–2(a)(1); *Los Angeles Dep't of Water and Power v. Manhart*, 435 U.S. 702, 707 & n. 13, 98 S.Ct. 1370, 1374 & n. 13, 55 L.Ed.2d 657 (1978)). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor*, 477 U.S. at 65, 67, 106 S.Ct. at 2405); *see Karibian v. Columbia Univ.*, 14 F.3d 773, 779 (2d Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

"To establish a hostile atmosphere ... plaintiffs must prove more than a few isolated incidents of racial enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell*, 782 F.2d at 1103 (citations omitted). Rather, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, — U.S. at —, 114 S.Ct. at 371. " '[M]ere utterance of an epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* at —, 114 S.Ct. at 370 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405). In evaluating the acrimony in the workplace, however, the Court must be mindful that "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for" the plaintiff to prove that he sustained psychological injury. *Id.* at —, 114 S.Ct. at 371 (citing *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405).

In addition to the foregoing, the Second Circuit Court of Appeals has held that "an employer [will be] liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian*, 14 F.3d at 780 (employer liability under Title VII for hostile workplace in regards to sexual harassment).

A careful examination of all the circumstances attending plaintiff's employment with the Port Authority between 1985 and 1987 leads the Court to conclude that although JFKIA was hardly a model of racial harmony during this time period, the pervasiveness of racial epithets, and overall racial animosity, was not sufficiently extensive to warrant a finding of a hostile work environment for purposes of Title VII. For the period in question, the Court has found the number of times in which racial slurs were uttered by supervisors in the plaintiff's presence not to

have exceeded five. *See supra* Findings of Fact ¶ 33. Although the Court regards the use of such epithets on so much as one occasion to be deplorable, for purposes of evaluating a hostile-environment claim under Title VII, the Court expressly considers their incidence to have been sporadic, and episodic in nature. Further, the Port Authority took reasonable measures to address its concerns about racial disharmony by, among other things, holding two separate meetings in November and December 1985 to allow for an airing of employee grievances, and through its subsequent interviews of employees, and investigation concerning alleged misconduct by white supervisory personnel.[10] *See supra* Findings of Fact ¶¶ 26, 29, 31; *Snell*, 782 F.2d at 1104 (Employer who is aware of a racially discriminatory atmosphere adversely affecting the emotional well-being and productivity of its employees has duty to take reasonable steps to remedy it.). Thus, in view of the Court's factual findings, and the Court's ultimate finding for purposes of this analysis that any intimidating conduct by supervisors relative to the plaintiff was infrequent, and interfered minimally with the performance of plaintiff's work, *see Harris*, —— U.S. at ——, 114 S.Ct. at 371, the Court concludes that the overall level of acrimony was not sufficiently offensive, pervasive or continuous to constitute a racially hostile work environment for purposes of Title VII. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir.1993); *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989); *compare Snell*, 782 F.2d at 1098 (providing example of unrelentingly hostile racial environment among correction officers in prison) *with Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1186, 1190 (2d Cir. 1987) (dismissing claim of hostile work environment under 42 U.S.C. § 1981 as the incidents were episodic, and not sufficiently continuous or concerted to be pervasive), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Accordingly,

plaintiff's hostile work environment claim is dismissed.

### 2. *Retaliation Claim*

■ The plaintiff also asserts that, upon attending the meeting of December 6, 1985 to discuss his perception of a racially hostile environment in his workplace, he was retaliated against, in violation of Section 704(a) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3(a), and that such reprisals persisted subsequent to his filing of three separate charges with the EEOC.

Section 704(a) of Title VII prohibits an employer from discriminating "against any of his employees or applicants for employment . . . because [he] has opposed any practice made . . . unlawful . . . by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e–3(a). "To establish a prima facie case of retaliation, 'a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action.'" *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 64 (2d Cir.1992) (quoting *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991)). "'Once a prima facie case is made, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions.'" *Id.* (quoting *Johnson*, 931 F.2d at 207). If the defendant meets its burden of articulating a permissible reason for its actions, then, consistent with the teachings of *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), the framework of shifting burdens becomes irrelevant, and the ultimate question becomes "whether plaintiff has proven 'that the defendant intentionally . . . retaliated against [him]' because, as in the instant case, [he] engaged in protected activity." *Cosgrove*, 9 F.3d at 1039 (quoting *St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2749).

---

**10.** As earlier discussed, the Port Authority's independent investigation was cut short as a result of Mr. Brady's filing of a complaint with the EEOC. *See supra* Findings of Fact ¶ 31.

Proceeding immediately to the ultimate question of retaliation,[11] the Court finds that the defendant did not retaliate against the plaintiff in any manner as a result of his voicing of objection to the defendant's employment practices, or through the plaintiff's filing of complaints with the EEOC. *See supra* Findings of Fact ¶¶ 32, 34. In connection with this claim, the Court, among other things, has found that the plaintiff's application for promotion to the position of Terminal Services Agent was rejected by the defendant for legitimate nondiscriminatory reasons, namely, plaintiff's failure to pass the qualifying examination for this position. *See supra* Findings of Fact ¶ 17. Accordingly, plaintiff's discriminatory retaliation claim likewise is dismissed.

## II. Claim under 42 U.S.C. § 1981

Plaintiff next claims that the defendant violated 42 U.S.C. § 1981 by failing to promote him to the position of Terminal Services Agent because of his race.[12]

42 U.S.C. § 1981, among other things, forbids discrimination in the " 'making and enforcement' of contracts...." *Patterson v. McLean Credit Union*, 491 U.S. 164, 176, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). In regard to claims brought under this statute prior to November 21, 1991, the Supreme Court has held that § 1981 applies to an individual's claim that he was denied promotion because of his race provided that "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer...." *Patterson*, 491 U.S. at 185, 109 S.Ct. at 2377. In analyzing a claim brought under this section, the Supreme Court has endorsed the use of the same framework of proof applicable to disparate treatment cases brought under Title VII, with "the ultimate issue whether the defendant intentionally discriminated against the plaintiff." *Id.* at 186, 109 S.Ct. at 2377 (citing *Texas Dep't of Community Affairs v.*

*Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

■ Assuming for purposes of argument that a promotion from the position of Baggage Handler to the position of Terminal Services Agent constitutes "an opportunity for a new and distinct relation between the employee and the employer," *Patterson*, 491 U.S. at 185, 109 S.Ct. at 2377, the Court concludes that the plaintiff fails to establish a prima facie case under this statute, and furthermore—proceeding to the ultimate issue—fails to demonstrate that the Port Authority discriminated against him. In order to show a prima facie case under 42 U.S.C. § 1981, the plaintiff must "prove by a preponderance of the evidence that [he] applied for and was qualified for an available position, that [he] was rejected, and that after [he] was rejected [the employer] either continued to seek applicants for the position, or ... filled the position with a white employee." *Patterson*, 491 U.S. at 186–87, 109 S.Ct. at 2378. Here, as discussed at length elsewhere within this Opinion and Order, the plaintiff has failed to demonstrate by the preponderance of the evidence that he was "qualified" for the position of Terminal Services Agent in view of his failure to pass both the written and oral portions of the eligibility examination therefor, and the Court's further factual findings that this examination was fairly administered, graded, and enforced, and constituted a reasonable measure of job performance. *See supra* Findings of Fact ¶¶ 9–11, 13–15, 17. Accordingly, plaintiff's claim under 42 U.S.C. § 1981 must be dismissed for failure to establish a prima facie case.

Further, even assuming *arguendo* that the plaintiff established a prima facie case of race discrimination under § 1981, the defendant still would prevail on this claim. Under this

---

11. For purposes of the burden-shifting analysis, the defendant's legitimate nondiscriminatory reason for not promoting the plaintiff is that he failed the qualifying examination to establish his eligibility for promotion.

12. The Court notes that this claim is asserted under the version of 42 U.S.C. § 1981 in effect

prior to amendment by the Civil Rights Act of 1991. *See Rivers v. Roadway Express, Inc.*, —— U.S. ——, —— ——, 114 S.Ct. 1510, 1519–20, 128 L.Ed.2d 274 (1994) (Civil Rights Act of 1991 does not apply retroactively to claims asserted under 42 U.S.C. § 1981 prior to November 21, 1991).

analysis, the Court finds the defendant employer to have rebutted any inference of discrimination through its presentation of evidence to show that the plaintiff was rejected for a legitimate, nondiscriminatory reason— in this case, his failure to pass the qualifying examination. Proceeding to the issue of ultimate concern, the plaintiff has failed to persuade the Court that the defendant intentionally discriminated against him by not promoting him. *See St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749. Thus, this analysis provides an additional ground to dismiss the plaintiff's claim under 42 U.S.C. § 1981.

### III. Pendent State Claim

Finally, plaintiff asserts a pendent state claim, that although unlabeled in the amended complaint, resounds alternatively as a claim for assault, or for intentional infliction of emotional distress, and accordingly will be analyzed under each cause of action. In this claim, plaintiff contends that the defendant, through its employees and agents, made statements directed to the plaintiff threatening or implying serious bodily injury and other forms of personal retaliation in response to plaintiff's filing of charges with the EEOC. He further asserts that the Port Authority has engaged in a practice and conscious plan of directing towards plaintiff a relentless personal attack upon plaintiff's race, moral character, and competence, and that said pattern of derogatory personal attacks has been instituted for the sole purpose of injuring and damaging plaintiff emotionally and in his career. According to plaintiff, as a result of the foregoing conduct, he has been placed in direct and immediate fear of his personal safety and well being, and has suffered intense physical and emotional distress. *See* Pl.Am. Compl., Count # 3.

#### A. *Assault*

■ Under New York law, to recover on a claim of assault, the plaintiff must show that another person made "an intentional attempt, displayed by violence or threatening gesture, to do injury to, or commit a battery upon," his or her person. 6 N.Y. Jur.2d: Assault— Civil Aspects § 1, at 194 (1980). A battery, in turn, "is a wrongful physical contact with

the person of another had by intention of the wrongdoer and without the consent of the victim." *Id.* In addition, "[w]ords not accompanied by circumstances inducing a reasonable apprehension of bodily harm, such as the movements of drawing back a fist, aiming a blow, or the show of a weapon, do not constitute an assault." *Id.* § 3, at 196.

In the instant case, the Court finds that the plaintiff has failed to establish by a preponderance of the evidence that he was the victim of the tort of assault. The closest the plaintiff comes to asserting a civil assault is in connection with the purported incident of November 10, 1985, with respect to which the plaintiff testified that John Mitchell, a Duty Supervisor, in rebuking the plaintiff for purportedly demanding a prohibited gratuity from two elderly women for carrying their luggage, called plaintiff into his office, and then used a racial slur, backed the plaintiff against the wall, and threatened "to get [him]." *See supra* Findings of Fact ¶¶ 20–21. The Court finds that, in connection with this incident, the plaintiff has failed to demonstrate that Mitchell placed him in a reasonable apprehension of imminent harmful or offensive contact. Rather, the Court regards the Mitchell's threat "to get [him]," as testified to by the plaintiff, to be forward-looking, and not of such nature as to lead the plaintiff to believe that Mr. Mitchell was about to strike him at or near that point in time. Further, there was no evidence presented at trial to suggest that Mr. Mitchell raised his fist or did anything, in conjunction with any harsh words, to suggest imminent bodily contact. *See* 6 N.Y.Jur.2d: Assault—Civil Aspects § 3, at 196 (1980). Indeed, the plaintiff has failed to convince the Court that on this, or any other occasion, he actually believed that he was imminently to be struck, or touched, by a Port Authority employee in a harmful or offensive manner. Accordingly, plaintiff's claim of assault is dismissed.

#### B. *Intentional Infliction of Emotional Distress*

■ To succeed in an action under New York law for intentional infliction of emotional distress, a plaintiff must prove:

(1) that defendant's conduct was so outrageous and shocking as to exceed all bounds of decency as measured by what the average member of the community would tolerate, (2) that defendant's conduct caused severe mental distress to plaintiff, and (3) that defendant acted with the desire to cause such distress, or acted recklessly and under circumstances that made it certain defendant knew that mental distress would result.

61 N.Y.Jur.2d: Fright, Shock, and Mental Disturbance § 8, at 515 (1987).

In the instant case, the Court finds that the plaintiff has failed to establish that he incurred severe mental distress in connection with the use of racial slurs by his supervisors at JFKIA, or that the frequency with which racial slurs were used in his presence was sufficient to permit recovery under New York law. *See supra* Findings of Fact ¶¶ 16, 33; *Leibowitz v. Bank Leumi Trust Co.,* 152 A.D.2d 169, 181–82, 548 N.Y.S.2d 513, 521 (App.Div.2d Dep't 1989) (Employee failed to state cause of action for intentional infliction of emotional distress based on allegation that her work supervisors called her ethnic slurs; while ethnic slurs allegedly hurled at employee demonstrated narrowmindedness and meanspiritedness, their use did not rise to such extreme or outrageous level as to meet threshold requirements of tort.). In so ruling, the Court does not condone the degrading and dehumanizing practice of uttering a racial slur. There simply is no justification for the use of such words, and the Court regards their usage, in all cases, to be unpardonable, and abhorrent. Furthermore, the Court is sympathetic to the plaintiff, and does not wish to minimize his circumstances. Rather, the Court merely rules, as is the case with the federal claims, that under New York law, it is unable to hold the defendant liable in view of the evidence presented at trial. Accordingly, this claim, too, must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court finds for the defendant on all claims. Accordingly, the Clerk is directed to enter judgment in favor of the defendant Port Authority dismissing all claims in this action.

SO ORDERED.