**William PAULING, Michelle Gillyard and Anthony Washington, Plaintiffs,**

v.

**SECRETARY OF the DEPARTMENT OF INTERIOR, Defendant.**

No. 95 Civ. 8408(DLC).

United States District Court,
S.D. New York.

April 14, 1997.

---

Lee F. Bantle, Bedlock, Levine & Hoffman, New York City, for Plaintiffs.

Jennifer K. Brown Assistant U. S. Attorney, Mary Jo White, U. S. Attorney, S.D. of New York, New York City, for Defendant.

## *OPINION*

COTE, District Judge:

On October 2, 1995, plaintiffs brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–16(a). Plaintiffs allege that, while working for the National Park Service of the Department of the Interior at the Statue of Liberty National Monument ("Statue of Liberty"), they were discriminated against based on their race. Defendant now brings this motion to dismiss, or, in the alternative for partial summary judgment, arguing that two of the defendants, William Pauling ("Pauling") and Anthony Washington ("Washington"), failed to exhaust their administrative remedies prior to filing suit. Plaintiffs have cross-moved for partial summary judgment striking defendant's affirmative defense of failure to exhaust administrative remedies. For the reasons set forth below, the motions are granted in part and denied in part.

## Background

### Anthony Washington

Unless otherwise noted, the following facts are undisputed or as stated by the plaintiffs. Anthony Washington, who is a thirty-two year old African–American male, was employed at the Statue of Liberty from September 23, 1990, to February 19, 1993. From 1991, Washington was a ranger. Washington alleges that he was subjected to discrimination on the basis of his race beginning some time in 1992, after a new person became Acting Chief Ranger. The new acting chief favored a group of all-white rangers known as the "Golden Boys" in assignments and training. Washington felt ignored by the acting chief, was given undesirable postings, and was falsely accused of theft. On one occasion Washington saw a noose hanging in the ranger office, and subsequently a black CPR doll was hanging in the noose. According to Washington, he contacted Nancy Rivera, one of the EEO counselors that worked at the Statue of Liberty, several times to complain about these acts of discrimination.

In February 1993, Washington was informed that he was being terminated for "budget reasons." In February, Washington contacted EEO counselor Rivera, who attempted to resolve the problem but was unsuccessful. Washington was also given a written statement of his Rights and Responsibilities for Processing Complaints of Discrimination. On March 9, 1993, Washington was given a Notice of Final Interview, which informed him that he was required to file his complaint with the Washington, D.C. office within 15 days. That same day, according to Washington, Rivera informed Washington that she would file for him a formal complaint with the Department of Interior Office for Equal Opportunity, and that she did so.

Rivera denies that she sent Washington's complaint to the Washington, D.C. office. She testified that it was her understanding that Washington was going to file the complaint with the Washington, D.C. office and that Washington told her that he had done so.

Washington contends that after he received no response to his complaint, he called the EEO office in Washington, D.C. several

times. Because the EEO office could not find Washington's complaint, he was asked to send a copy, which he did on May 19, 1993. On September 30, 1993, Washington's complaint was rejected as untimely by the EEO office in Washington, D.C. The rejection letter notes that Washington's Notice of Final Interview was dated March 9, 1993, his complaint form was dated February 9, 1993, and the description of his allegations was dated March 2, 1993. The letter goes on to detail all of Washington's allegations, and then explains that they are time barred. In an underscored paragraph, the letter incorrectly identifies the date of Washington's complaint as June 3, 1993, and then informs Washington of his appeal rights. Washington did not appeal this decision because he was "discouraged" and did not think he could win an appeal.

In November 1993, after Washington was discharged, he was listed on a certificate of candidates eligible for the position of permanent park ranger at the Statue of Liberty. Washington was not selected for this position. Washington contends that the candidate who was selected, who was Caucasian, had a lower rating score than Washington.

*William Pauling*

Pauling, who is an African–American male, worked as a utility systems repair operator at the Statue of Liberty between June 1990 and November 3, 1993. Pauling alleges that he was discriminated against based on his race. He claims that after a new supervisor was installed, he was not given work orders or overtime, was ignored and was falsely accused of wrongdoing.

On November 3, 1993, during the cleanup of an oil spill in the waters around Liberty Island, Pauling was verbally assaulted by his supervisor, David Bosakowski. After this argument, Pauling left the Statue of Liberty and never returned to his job. Pauling submitted a workers' compensation claim, asserting that hostility at his job and other job-related stress resulted in a disabling nervous disorder. The Park Service denied this claim. On August 5, 1995, the Park Service terminated Pauling for failing to return to work.

Pauling contends that it was difficult for him to make complaints to the EEO counselors since he was stationed at the Statue of Liberty, and was instructed that regulations prevented employees from going to the personnel department on Ellis Island during work hours without the permission of a supervisor. On the occasions Pauling requested permission, it was denied. Pauling acknowledges that he knew he could call or write to the EEO officer on Ellis Island, but he did not. Moreover, Pauling stated in his deposition that he knew another EEO officer "floated between" Liberty and Ellis Islands.

Nevertheless, Pauling claims that on four occasions he communicated with Barry Moreno, an EEO counselor whose office was on Ellis Island, about problems he was having at work. First, in late 1992 or early 1993, Pauling went to see Moreno, and told him that he wanted to discuss "Dave." David Bosakowski was the supervisor with whom Pauling was having difficulty. Pauling's meeting with Moreno was interrupted, and neither Pauling nor Moreno followed up on this conversation.

Second, Moreno (but not Pauling) recalls a meeting in approximately April 1993, in which Pauling expressed his concern about racial discrimination to which he was being subjected by the acting Buildings and Utilities supervisor, Joe Codispoti. After a joint meeting with Moreno, Pauling and Codispoti reached an agreement that they would try to get along with each other. Pauling told Moreno that he was not going to file a formal complaint, but hinted that if the situation did not improve, Pauling would come back to Moreno. Pauling never approached Moreno again about this situation.

Third, on July 14, 1993, Pauling sent Moreno a copy of a handwritten letter Pauling had written to the Acting Chief of Maintenance responding to her denial of his request that he be allowed to meet with the Assistant Superintendent. The letter does not indicate on its face the reason Pauling wanted to speak with the Assistant Superintendent, and does not request that Moreno do anything. Moreno and Pauling never contacted each other about this letter.

Fourth, after the November 3, 1993 incident between Pauling and his supervisor, Pauling called and left messages for Moreno. Moreno learned from another employee at the Statue of Liberty that Pauling wanted to speak to him concerning a possible EEO complaint. Moreno testified in his deposition that he returned Pauling's calls several times, left messages with Pauling's wife and son, but was unable to reach him.

On March 28, 1994, Pauling's attorney sent a letter to the National Park Service detailing the racial discrimination to which Pauling claims he was subjected. In response, the Park Service informed Pauling that he was required to pursue the counselling procedure before filing a formal complaint. Pauling engaged in the counselling process with Moreno on June 1, 1994. Pauling received a Notice of Final Interview on July 9, 1994. On July 13, 1994, Pauling filed a formal complaint alleging race discrimination. The Park Service responded on January 13, 1995, by requesting an explanation for the delay between November 3, 1993 and March 28, 1994. By letter dated February 10, 1995, Pauling's attorney responded. The Park Service had not acted on Pauling's complaint by October 2, 1995, when this action was filed.

Pauling acknowledges that he knew that he had to speak with a counsellor in order to complain about race discrimination. Pauling states, however, that he was not aware that such contact had to be initiated within forty-five days of the discriminatory incident.

Moreno indicates that from 1988 until 1995, an informational poster was hung on employee bulletin boards at Ellis and Liberty Islands. The poster contained pictures of the EEO counsellors at the Statue of Liberty, as well as their phone numbers. The bottom of the poster contains the legend, "[e]mployee(s) or applicant(s) for employment should contact one of the above individuals within 30 calendar days of the alleged discriminatory action(s) or event." On Liberty Island that poster was in the dispatch area of the main entrance to the administration building. This is also the location of other employee notices. The posters were also displayed on Ellis Island in the ranger office and in the museum building where other employee notices were posted.

## Discussion

### Summary Judgment

Defendant has moved either to dismiss or for partial summary judgment. Because resolving the issues of whether Washington and Pauling exhausted their administrative remedies requires this Court to look beyond the pleadings to the affidavits, deposition testimony, and documentary evidence provided by the parties, this motion is appropriately viewed as for partial summary judgment rather than as a motion to dismiss.

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In making this judgment, the burden is on the moving party, and all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts which demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). Thus, in determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on evidence in the record, and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

### Title VII's Administrative Requirements

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, provides that all federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). Title VII is the exclusive

remedy available to federal employees for race discrimination. *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir.1996). Title VII requires a litigant to "exhaust available administrative remedies in a timely fashion." *Id. See also Brown v. General Servs, Admin.*, 425 U.S. 820, 832, 96 S.Ct. 1961, 1967–68, 48 L.Ed.2d 402 (1976). These time limits are prescribed by the Equal Employment Opportunity Commission ("EEOC") by regulation. *See* 29 C.F.R. §§ 1614.101–1614.607 (1996).

Before filing a formal complaint, an employee who believes he or she has been discriminated against "must consult a Counselor ... in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). The employee "must *initiate contact* with a Counselor within 45 days of the date of the matter alleged to be discriminatory." *Id.* § 1614.105(a)(1) (emphasis supplied).[1] The regulations also provide that the agency shall extend this time limit if (1) the employee shows that he or she was not aware of the time limits; (2) the employee shows that he or she was not aware that the discriminatory action had occurred; or (3) the employee was prevented from complying with the time limits due to circumstances beyond the employee's control. *Id.* § 1614.105(a)(2).

When the initial counselling session takes place, "Counselors must advise individuals in writing of their rights and responsibilities." *Id.* § 1614.105(b). Within thirty days of the employee having initiated contact, the counselor must conduct a "final interview," and if the employee and the counselor have not been able to resolve the situation, inform the employee in writing of his or her right to file a discrimination complaint with the agency. *Id.* § 1614.105(d). This is called the "Notice of Final Interview." The employee has 15 days after the Notice of Final Interview to file a formal complaint with the agency. *Id.* § 1614.106(a) & (b).

Once a formal complaint is filed, the agency has 180 days to investigate. *Id.* § 1614.108(e). If the agency does not act on the employee's complaint within 180 days, the employee may bring a civil action in United States District Court. *Id.* § 1614.408(b). Once the agency issues a final decision, the employee may appeal to the EEOC within 30 days, *id.* §§ 1614.401(a), 1614.402(a), or file a civil action in United States District Court within 90 days. 42 U.S.C. § 2000e–16(c). *See also* 29 C.F.R. § 1614.408(a).

The Second Circuit has recently noted that the time limits established by Title VII and the regulation are "analogous to a statute of limitations, and [are], therefore, considered subject to waiver, estoppel, and equitable tolling." *Briones*, 101 F.3d at 290. See also *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 94–95, 111 S.Ct. 453, 456–57, 112 L.Ed.2d 435 (1990).

*Anthony Washington*

On September 30, 1993, the agency informed Washington that it had dismissed his complaint as untimely, of his right to appeal or file a civil action, and of the appropriate time limits. Washington took no action and was not joined in this lawsuit as a plaintiff until over two years after the agency's final decision. Because Washington's action was filed more than 90 days after the final agency determination, it is untimely.

Washington advances several arguments against a finding that this action is untimely. First, Washington argues that equitable tolling and equitable estoppel excuse his failure to exhaust administrative remedies. Equitable tolling and estoppel may, in certain circumstances, excuse a failure to follow the timing requirements of Title VII. *Irwin*, 498 U.S. at 94–95, 111 S.Ct. at 456–57; *Briones*, 101 F.3d at 290. In *Irwin* the Supreme Court noted that "courts have typically extended equitable relief only sparingly." This is especially so where the defendant is a department of the United States Government, because suits against the Government involve a waiver of sovereign immunity. *Irwin*, 498 U.S. at 96, 111 S.Ct. at 457–58.

Noting that government employees are not entitled to more favorable treatment than private employees, the Court listed cir-

---

1. The former rule, which was applicable until April 10, 1992, was 30 days. *Briones*, 101 F.3d at 290 & n. 1.

cumstances in which it had applied equitable tolling in private employment discrimination cases:

> We have allowed equitable tolling in situations where the claimant has actively pursued his judical remedies by *filing a defective pleading during the statutory period*, or where the complainant has been *induced or tricked by his adversary's misconduct* into allowing the filing deadline to pass.

*Irwin*, 498 U.S. at 96, 111 S.Ct. at 457–58 (emphasis supplied). *See also Dillman v. Combustion Engineering, Inc.*, 784 F.2d 57, 60 (2d Cir.1986) (employer's conduct must be "extraordinary" to justify applying equitable tolling).[2] The Supreme Court also stated that "[w]e have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights," and remarked that equitable tolling does not "extend to what is at best a garden variety claim of excusable neglect." *Irwin*, 498 U.S. at 96, 111 S.Ct. at 458. *See also South v. Saab Cars USA, Inc.*, 28 F.3d 9, 12 (2d Cir.1994) ("a plaintiff's failure to act diligently is not a reason to invoke equitable tolling"). Neither of the circumstances identified in *Irwin* provides relief to Washington. He did not file a timely though defective pleading and he can point to no trickery by the Government that caused him to delay filing an appeal or lawsuit after receiving the September 30, 1993 letter.

▪ Washington also asserts that equitable estoppel excuses his failure to act in a timely fashion. The Second Circuit has noted that equitable estoppel

> "is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay bringing his lawsuit." The doctrine properly may be invoked in a case in which the employer has misrepresented the length of the limitations period or in some other way has *"lulled the plaintiff* into

believing that it was not necessary for him to commence litigation."

*Dillman*, 784 F.2d at 61 (citations omitted) (emphasis supplied). *See also Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 48–49 (2d Cir.1985); *Angotti v. Kenyon & Kenyon*, 929 F.Supp. 651, 655 (S.D.N.Y.1996). Here, no Government conduct lulled Washington into believing he did not need to act within the time limits described in the September 30, 1993 letter from the Government.

In support of his equitable arguments, Washington points to the facts that (1) he was not given a written copy of his rights and responsibilities until February 1993; (2) the Government never acknowledged receipt of the complaint Washington alleges Rivera filed on his behalf; and (3) Rivera mislead Washington into thinking that he did not need to file a complaint and that she would take care of it for him. But all of these issues are irrelevant. These excuses do not explain Washington's failure timely to appeal the agency decision or to file a civil action— they relate to events which occurred before he received the September 30 letter.

▪ Washington also argues that the September 30 letter misidentified his allegations and contained other errors and thus failed to give him sufficient notice of what allegations were being denied so as to excuse his failure to appeal or file a civil action within the allotted time period. Washington points to the facts that (1) in one place the letter erroneously describes his complaint as dated June 3, 1993 rather than May 19, 1993; and (2) the letter identifies Washington's allegation that he was not selected for a permanent position as having occurred in February 1993, when, in fact he had alleged that this occurred on several occasions dating back to mid–1992 or earlier.

These "errors" are not sufficiently material to justify the application of the doctrines of equitable tolling or equitable estoppel.

---

2. In *Dillman*, which was decided before *Irwin*, the Second Circuit distinguished between equitable tolling and equitable estoppel, defining equitable tolling as applying where a plaintiff is "unaware of his cause of action." *Dillman*, 784 F.2d at 60 (citation and quotation marks omit-

ted). That is not a circumstance that occurs in the case of Pauling and Washington except with respect to Washington's November 1993 claim which is discussed below. *Irwin* did not have occasion to address any distinction between equitable tolling and equitable estoppel.

While the letter does in one place identify Washington's complaint by an incorrect date, the correct date is listed in at least two other places. In addition, while the letter may have neglected to note that Washington was denied a permanent position on more than one occasion, it clearly notes that this allegation was before the agency, and in any event the overall description adequately describes the allegation. More importantly, it is not disputed that Washington received the September 30 letter, and that he knew that it dismissed his complaint. Washington has not alleged that he failed to appeal or sue because the "errors" in the September 30 letter caused him to believe that some of his allegations were not dismissed—he testified that he did not appeal because he was "discouraged" and decided to "move on" with his life.

■ Washington's next argument is that he did not file an appeal or a timely civil action because to do so would have been futile. Labelling an action as futile does not make it so. If Washington believed that the dismissal of his complaint on the ground that it was untimely was unfair in light of his reliance on Rivera's alleged promise to file his complaint for him, then Washington should have made that argument to the EEOC or a court in 1993. There is no reason to believe that either the EEOC or a court would have been less sympathetic to such an appeal in 1993 than when made in a lawsuit two years later.

■ Washington's third argument is that the newly-discovered alleged discrimination against him—the agency's failure to hire him to a permanent position in November 1993—provides a separate basis for this Court to exercise jurisdiction over his case. Washington employs several arguments to reach this conclusion. First, Washington contends that exhaustion is not required for the November 1993 claim because it is "reasonably related" to his other claims. The Second Circuit has held that

> [i]n an action in which [the] procedural requirements have been satisfied, the plaintiff may raise any claim that is "reasonably related" to those asserted in the

EEOC filing, even if that claim was not expressly addressed by EEOC.

*Cornwell v. Robinson,* 23 F.3d 694, 706 (2d Cir.1994). *See also Butts v. City of New York Dep't of Housing,* 990 F.2d 1397, 1402 (2d Cir.1993) (describing three types of claims that are "reasonably related"); *Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 967 (2d Cir.1984); *Kirkland v. Buffalo Bd. of Ed.,* 622 F.2d 1066, 1068 (2d Cir.1980) (per curiam). But, this doctrine is inapplicable to Washington's case. Because none of Washington's earlier allegations were timely raised, there is no claim to which the new allegation may be "reasonably related." *Butts,* 990 F.2d at 1403.

■ Second, Washington argues that the November 1993 incident is part of a "continuing violation," and thus it and his earlier complaints may all be brought in this lawsuit. The Second Circuit has discussed the "continuing violation" exception:

> The continuing violation exception applies when there is evidence of an *ongoing discriminatory policy or practice* such as the use of discriminatory seniority lists or employment tests. Although discrete incidents of discrimination that are not the result of a discriminatory policy or practice will not ordinarily amount to a continuing violation, *"where specific and related instances of discrimination are Permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice,"* a continuing violation may be found.

*Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996) (emphasis supplied). *See also Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906–07 (2d Cir.1997); *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Demotion, failure to promote, and termination have all been deemed discrete acts. *See, e.g., Varrone v. Staten Island Univ. Hosp.,* 1996 WL 524390, *2 (E.D.N.Y. Sept.6, 1996); *Lloyd v. WABC–TV,* 879 F.Supp. 394, 400 (S.D.N.Y.1995); *Samuel v. Merrill Lynch Pierce Fenner & Smith,* 771 F.Supp. 47, 49

(S.D.N.Y.1991); *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989).

The continuing violation theory is inapplicable to this case for several reasons. First, Washington does not provide any evidence of an ongoing discriminatory practice or policy. Rather, his factual allegations consist of discrete instances of discrimination—most notably multiple failures to promote. Second, Washington submits no evidence that the Statue of Liberty has been aware of related instances of discrimination and has failed over a period of time to remedy them. Indeed, the incidents of discrimination alleged by Washington do not appear to be related. Third, even if Washington could establish that the November 1993 incident is evidence of an ongoing discriminatory practice or policy, the continuing violation exception only applies when "a Title VII plaintiff files an EEOC charge that is *timely as to any incident of discrimination* in furtherance of an ongoing policy of discrimination." *Lambert,* 10 F.3d at 53 (emphasis supplied). Here, *none* of Washington's allegations are timely. He has failed to follow the correct administrative procedure for *any* claims. Accordingly, the continuing violation theory does not excuse the fact that Washington failed to exhaust administrative remedies.

■ Washington's third argument with respect to the November 1993 incident is that even if this Court dismisses his other claims as untimely, it may still hear his claim arising out of the November 1993 incident because he could not have raised the November 1993 claim in an administrative proceeding. Washington argues that because he did not know about the November 1993 failure to promote him until discovery in this lawsuit, the complaint-filing requirements must be tolled up to the date he discovered this instance of discrimination. Further, Washington contends that the administrative exhaustion requirement should be excused because: (1) the EEOC would dismiss any administrative claim regarding the November 1993 incident because this lawsuit is pending; and (2) raising this claim with the agency would be futile because the Government has already denied his other claims of failure to pro-

mote—which he alleges occurred in 1991 and 1992—and thus would deny this claim as well.

I hold that the November 1993 incident cannot be pursued in this lawsuit. Washington's argument is circular. His position is that while the earlier claims are time-barred, they are rescued by the November 1993 claim, which was never administratively exhausted, and his failure to exhaust is excused by the existence of this lawsuit, which is based on the time-barred claims.

It is undisputed that Washington has failed to exhaust his administrative remedies for the November 1993 claim. Since the other claims in this lawsuit are untimely and must be dismissed, the pendency of this suit will not be an impediment to an administrative inquiry. Moreover, invoking the administrative scheme would not be futile merely because the Government has in this litigation denied Washington's other allegations of failure to promote. The November 1993 incident is a new allegation that the Statue of Liberty, the Park Service, and the EEOC have not been given an opportunity to investigate. This is the purpose underlying the exhaustion requirement. *See Butts,* 990 F.2d at 1401–02. Accordingly, Washington must first bring this claim through the procedures prescribed by the EEOC regulations.[3]

■ Washington's final argument, citing *Snell v. Suffolk County,* 782 F.2d 1094 (2d Cir.1986), is that the "single filing" rule permits him to maintain this action with his co-plaintiffs. *Snell* adopted the "single filing" rule which allows a plaintiff who did not follow the appropriate administrative procedure to join an action with co-plaintiffs who did comply with the exhaustion requirements, if their individual claims arise out of similar discriminatory treatment in the same time frame. *Id.* at 1100. The Second Circuit noted, however, that

[t]his presupposes, of course, that the subsequent claims are *sufficiently similar* to the original complaint and *the employer received adequate notice and an opportunity for conciliation.*

---

3. The forty-five day period for "initiating con-

tact" remains tolled until the date of this ruling.

*Id.* (emphasis supplied). The "single filing" rule does not apply to Washington's claims because they are not sufficiently similar to those of his co-plaintiffs to provide the Statute of Liberty with adequate notice. The plaintiffs worked in different departments, complain of different supervisors, and identify different types of wrongs. The only unifying fact is that they allege racial discrimination at the Statue of Liberty. This is insufficient to make their complaints "sufficiently similar" to relieve Washington of the obligation to exhaust administrative remedies.[4]

Accordingly, because Washington failed to file an appeal or civil action in a timely fashion after having received the September 30, 1993 letter dismissing his complaint, I grant partial summary judgment in favor of the defendant and dismiss Washington's claims.

*William Pauling*

The Government argues that Pauling failed to exhaust administrative remedies because he did not "initiate contact" with an EEO counselor within 45 days of any of the discriminatory events of which he complains. The Government contends that the first notice the Statue of Liberty had of Pauling's allegations of race discrimination was the March 28, 1994 letter from Pauling's attorney, which was sent more than 45 days after Pauling left his job. Pauling responds by arguing that he initiated contact with EEO counselor Moreno on four occasions prior to the March 28 letter and that Moreno failed to fulfill his duty under the regulations to inform Pauling of his rights and responsibilities, to investigate, and to issue a Notice of Final Interview within the time periods prescribed by the regulations. Under these circumstances, Pauling claims that equitable estoppel or equitable tolling should be applied.

In order to determine the meaning of "initiate contact" in the EEOC regulations, it is appropriate to consult the EEOC's interpretation of its regulations. An agency's interpretation of its own regulations is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). *See also Martin v. Occupational Safety & Health Rev. Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991); *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965); John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules,* 96 Colum. L.Rev. 612, 627–31 (1996).

■ The EEOC has held that in order to "initiate contact" an employee must (1) contact an agency official logically connected with the EEO process, even if that official is not an EEO counselor; (2) exhibit an intent to begin the EEO process; and (3) allege that an incident in question is based on discrimination. *See Moss v. Perry,* App. No. 01962472, 1997 WL 91106, at *2 (E.E.O.C. Feb. 24, 1997); *Dunlavey v. Chater,* App. No. 01964628, 1997 WL 73502, at *1 (E.E.O.C. Feb. 14, 1997); *Mendez v. Reich,* App. No. 01962664, 1996 WL 658038, at *2 (E.E.O.C. Nov. 7, 1996); *Temple v. Goldin,* App. No. 01960358, 1996 WL 528819, at *2 (E.E.O.C. Sept. 6, 1996); *Correa–Montalvo v. Atwood,* App. No. 01955821, 1996 WL 134954, at *2 (E.E.O.C. March 22, 1996). Pauling argues that the EEOC's reading of "initiate contact" requires too much of employees insofar as it mandates that the employee communicate an affirmative decision to pursue the EEO counseling process. The agency's reading, however, is reasonable, not plainly erroneous, and entitled to deference.

■ I turn now to consider the four instances in which Pauling claims he "initiated contact" with Moreno. The most substantive contact on which Pauling relies is the April 1993 meeting with Moreno where they talked about Joe Codispoti, a meeting that Pauling

---

4. Defendant also seeks discovery under Rule 56(f), Fed.R.Civ.P. Defendant primarily desires to learn more about the circumstances surrounding Rivera's filing of a complaint on behalf of Washington. The discovery defendant requests, however, is irrelevant because it does not relate to Washington's failure to appeal or file a civil action within the correct time after the September 30 letter. Accordingly, Washington's Rule 56(f) motion is denied.

does not remember.[5] I find that this meeting constituted "initiating contact," even though Pauling does not recall the meeting.

The Government argues that Moreno pursued an "informal" resolution of the issue, outside of the regulatory pre-complaint processing procedure. Taking actions outside the framework adopted by the regulations, however, circumvents the protections embodied in the rules. Therefore, I reject the Government's contention that the initial meeting between Pauling and Moreno was not "initiating contact" because the situation was ultimately informally resolved. Pauling came to Moreno and complained about Codispoti and racial discrimination. That is sufficient to indicate an intent to begin the EEO process.

■ Because Pauling "initiated contact," Moreno should have provided Pauling with written notice of his rights and responsibilities pursuant to 29 C.F.R. § 1614.105(b). It appears, however, that Moreno was not required to give Pauling the Notice of Final Interview under § 1614.105(d), because after the joint meeting between Codispoti, Pauling and Moreno, Pauling indicated that the issue had been resolved to his satisfaction, declined to file a formal complaint, and never returned to address the issue again.

■ The other three communications to which Pauling points as instances of "initiating contact" are easily dismissed. First, the late 1992 or early 1993 meeting in which Pauling told Moreno that he wanted to discuss "Dave" was not sufficient contact to evince an intent to initiate the EEO process. The meeting was interrupted, and Pauling never made an effort to contact Moreno again in order to inform him of the substance of his complaint. Moreno could not have known from this short contact that Pauling wished to begin the EEO process.

■ Second, Pauling sending Moreno a copy of the letter in July 1993 in which Pauling protested the denial of his request for a meeting with the Assistant Superintendent was also not sufficient to constitute "initiating contact." The letter makes no allegations of discrimination, and does not even indicate why Pauling wanted a meeting with the Assistant Superintendent. Moreover, the letter does not request Moreno to do anything.

■ Finally, Pauling's phone calls in November 1993 are also not sufficient to establish the required contact. Pauling never actually spoke to Moreno and only left messages. Moreno attempted on several occasions to reach Pauling, even leaving messages with Pauling's wife and son, but was unable to reach him. Because Pauling did not speak with Moreno and did not convey the substance of any alleged discrimination, I hold that these phone calls are insufficient to constitute an initiation of contact.[6] Accordingly, the claims based on these three "communications" are time barred.

Pauling argues, however, that even if he did fail to "initiate contact" within the 45–day time limit as to these three latter claims, his failure should be excused either under the regulatory tolling provision or under the general doctrines of equitable tolling and equitable estoppel since he was unaware of the time limit. The EEO regulations provide that, under certain circumstances, the agency must waive the 45 day requirement, such as "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them" or "that despite due diligence he or she was prevented

---

5. Moreno is the only one who remembers this meeting. In his deposition Pauling testified that he never spoke to Moreno about Codispoti and that his only meeting with Moreno concerned "Dave" and was interrupted before any discussion could ensue.

6. Pauling argues that his failure to exhaust administrative remedies should be excused because he was suffering from a "major depressive episode" in November 1993. Pauling has failed, however, to provide any evidence that any medi-

cal problems he was experiencing at that time were so severe that they prevented him from initiating contact with an EEO representative. In fact, Pauling's affidavit makes no mention of his medical condition, and the evidence Pauling submitted from medical personnel indicates only that he was too ill to work, not that he was too ill to comprehend his rights and to file a complaint. It is not surprising, therefore, that during this same time period, Pauling was able to pursue his claim for workers' compensation.

by circumstances beyond his or her control from contacting the counselor within the time limits." 29 C.F.R. § 1614.105(a)(2). *See also Jakubiak v. Perry*, 101 F.3d 23, 27 (4th Cir. 1996); *Johnson v. Runyon*, 47 F.3d 911, 917–18 (7th Cir.1995).

The Government has presented evidence that EEO posters were displayed at Pauling's work site and gave notice that employees should report any discriminatory actions to an EEO officer within 30 days of the incident. These posters were posted in the same area as other employee announcements, which indicates that they were reasonably geared to inform employees of the appropriate time limits. The EEOC has held that a "notice posted at [the employee's] work site" constitutes "constructive notice of the time limits applicable to initiating the EEO process." *Temple v. Goldin*, App. No. 01960358, 1996 WL 528819, at *2 (E.E.O.C. Sept. 6, 1996). Moreover, in *dicta*, the Second Circuit has observed that posting alone "may be sufficient to defeat an employee's equitable tolling claim, since a court can presume knowledge of statutory rights based on the notices." *Dillman*, 784 F.2d at 60. *See also Rivera v. United States Postal Serv.*, 1996 WL 435433, at *3 (E.D.N.Y. July 25, 1996). I hold that the poster gave Pauling constructive notice of the required time limits for filing an EEO complaint.

Contrary to plaintiff's argument, the fact that the poster stated that employees "should" contact an EEO counselor rather than "must" does not suggest that this is insufficient notice. The poster indicated the appropriate course of events, and any difference in connotation between "should" and "must" is not sufficient to raise a material issue of fact.

In addition, the fact that the poster indicated the older 30–day period rather than the current 45–day period for contacting an EEO counselor is immaterial. The poster adequately informed Pauling and the other employees of the requirement that they initiate contact with an EEO counselor within a strict time period. Unlike the situation in *Johnson*, 47 F.3d at 919–20, this error would not have led Pauling to believe that his complaint was time barred.

Pauling's statement in opposition to this motion that he was not aware of the 45–day period is not sufficient to create a material issue of fact. *Posey v. Skyline Corp.*, 702 F.2d 102, 105–06 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Pauling has not denied that the notice was conspicuously posted, as described by the defendant. Indeed, Pauling admits that he knew that he was required to contact an EEO counselor to lodge a complaint, and argues that he attempted to do so on several occasions. Under these circumstances, Pauling has failed to offer any evidence to rebut the fact that he was constructively notified that he was required to complain to an EEO officer within a certain time period.

■ Citing Rule 56(f), Fed.R.Civ.P., Pauling argues that summary judgment is inappropriate because the poster was produced to the plaintiffs during the briefing of this motion, and thus plaintiffs were prevented from deposing the Government's witnesses about it. Rule 56(f) provides that where a party does not have sufficient essential information to justify its opposition to the motion, the Court may

refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or make such other order as is just.

Rule 56(f), Fed.R.Civ.P. The Second Circuit has developed a four-part test for determining when a party opposing a summary judgment motion is entitled to further discovery before the motion will be considered. The Second Circuit requires the party to file an affidavit explaining:

1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

2) how those facts are reasonably expected to create a genuine issue of material fact; and

3) what efforts the affiant has made to obtain those facts; and

4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.

1985). *See also Sage Realty Corp. v. Insurance Co. of N.Am.*, 34 F.3d 124, 128 (2d Cir.1994); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir.1994).

In an affidavit, Pauling's attorney states that he wishes to take discovery about the placement of the poster, how its "equivocal" language was understood, and whether its contents changed over time. How the language of the poster was "understood" by Government witnesses is irrelevant, and Pauling does not dispute that the posters were on the employee bulletin boards during the relevant time period. Thus, Pauling has not met his burden of articulating a reasonable expectation that he will be able to raise a material issue through further discovery. Nevertheless, because the Government produced the poster during the pendency of this motion and after most of the depositions had been conducted, I will allow Pauling to take one deposition in order to test whether the poster is sufficient to constitute constructive notice.

 Pauling's next equitable argument is based on the fact that he was prevented by his supervisor from going to Ellis Island to complain to Moreno. But, Pauling acknowledges that he could have called or written to Moreno—in fact he did so on more than one occasion. Pauling also acknowledges that he could have contacted Moreno in person while he was not on duty. Pauling admits that he knew Rivera was also an EEO counselor, and that she spent at least some time on Liberty Island. Finally, after Pauling was terminated in November 1993, nothing prevented him from going to see Moreno to lodge a complaint. Therefore, the alleged "policy" preventing employees from going to Ellis Island does not serve as the basis for equitable relief from the 45–day time limit.

### Conclusion

Defendant's motion for summary judgment as to Washington's claims is granted, and Washington's motion for summary judgment is denied.

Pursuant to a scheduling order of this date, Pauling and defendant will be given the opportunity to brief further the impact on Pauling's claims of this Court's ruling that the April 1993 meeting constitutes initiation of contact. In addition, Pauling will be permitted one deposition limited to the issue of the EEO poster displayed at the Statue of Liberty.

SO ORDERED: